(No. 72572.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHARLES A. WHEELER, Appellant.

*Opinion filed October 15, 1992.*

Robert Agostinelli, Deputy Defender, and Mark D. Fisher, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellant.

Roland Burris, Attorney General, of Springfield, and Marc Bernabei, State's Attorney, of Princeton (Norbert J. Goetten, John X. Breslin and Gary F. Gnidovec, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

Defendant, Charles Wheeler, was indicted for aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1)). After a jury trial in the circuit court of Bureau County, defendant was convicted and sentenced

to 20 years in the Illinois Department of Corrections. The appellate court, with one justice dissenting, affirmed (216 Ill. App. 3d 609) and we granted defendant's petition for leave to appeal (134 Ill. 2d R. 315).

In this appeal, defendant raises three issues. First, defendant argues he was denied a fair trial because the trial court denied his motion requesting an order which would have required the victim to submit to a mental examination by defendant's expert. Second, defendant contends the trial court erred in granting the State's motion *in limine* which prevented defendant from presenting psychological evidence that he did not have traits characteristic of a pedophile. Third, defendant argues his conviction must be reversed due to prosecutorial misconduct. Because of our resolution of the first issue, we need not address the remaining questions presented.

## I

Prior to trial, defendant learned that the State intended to introduce expert testimony that the victim, C.K., suffered from rape trauma syndrome. Such testimony is admissible under section 115—7.2 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.2). Defendant filed a motion seeking to compel the victim to submit to an examination by defendant's expert or, in the alternative, to bar the State from introducing testimony on rape trauma syndrome. Based on its reading of sections 115—7.1 and 115—7.2 of the Code of Criminal Procedure (Ill. Rev. Stat. 1989, ch. 38, pars. 115—7.1, 115—7.2), the trial court denied defendant's motion. In addition, prior to trial the court found defendant to be indigent and granted $250 of public funds to be used to pay the costs of obtaining an expert witness to testify at trial.

At trial, C.K.'s mother, Cheryl K., testified that she and defendant were married in November 1977 and C.K.

was born to them in February 1978. Approximately nine months later, Cheryl and defendant separated and eventually divorced. After the separation, defendant had no contact with C.K. until February 1987. At that time, C.K. called defendant and requested a meeting. After their first meeting, she spent several weekends with defendant at his home. In addition, C.K. spent the summer of 1987 with defendant. During this period, she spoke highly of her father and seemed happy that he was playing a role in her life. Cheryl stated that on several occasions C.K. expressed a desire to live with defendant.

Cheryl testified that C.K. went to summer camp in the summer of 1988 and there was no personal contact between defendant and her from June 1988 to January 1989. In December 1988, C.K. asked to see her father again. According to Cheryl, C.K. visited defendant on two or three weekends in January 1989. Cheryl was unsure about the dates of the visits although she believed one of the weekends coincided with the Martin Luther King Jr. holiday. Cheryl stated that C.K. continued to visit defendant until Easter of 1989, but that the last time she was alone with defendant was in January or February of 1989. On the weekends of visits, defendant picked up C.K. on either Friday night or Saturday morning and returned her on Sunday night.

On July 14, 1989, Cheryl suggested to her that she spend part of the summer with defendant. At this time, C.K. began to cry and told Cheryl that defendant had sexually assaulted her. Cheryl then called the authorities in Iowa to report the assault.

The victim, who was 11 years old at the time of the trial, testified that she first met defendant in February of 1987. She stated that two or three weeks after they met, defendant sexually abused her. At this time, defendant was living with his girlfriend, Cathy Cannon.

C.K. stated that she may have told the police that the abuse did not begin until June of 1987, at a time when Cannon and defendant were not seeing each other. She also stated that she slept in defendant's bed almost every night that summer.

C.K. stated that she reinitiated contact with defendant in December of 1988 because she hoped he had changed and stated that she visited defendant two or three times in January of 1989. She thought the last time she was alone with defendant was the weekend of the Martin Luther King Jr. holiday. She stated that during this visit, defendant told her to sleep in his bed. Defendant got into bed with her and was naked at the time. Defendant kissed C.K. on the cheek and placed his tongue in her mouth. Defendant removed her underwear and rubbed her vagina. Defendant then held C.K.'s legs apart and performed oral sex on her. Defendant rolled onto his back and had C.K. lie on top of him with her head near his groin. C.K. refused defendant's request that she put his penis in her mouth but she did squeeze it. C.K. described defendant's penis as hairy and stiff, and she stated that sticky stuff came out. When this occurred, she stated, the defendant was breathing heavily "like a dog does after it gets done running." Throughout the ordeal, defendant told the victim that the acts were practice for when she got older and also that she reminded him of her mother.

The victim testified that defendant had assaulted her in a similar fashion on one or two other weekends in January 1989. She also testified that defendant told her not to tell anyone about the assault because he would go to prison. She stated she did not tell anyone initially because she was afraid.

Elsie (Pat) Elmore, an investigator with the Iowa Department of Human Services, testified that on July 14, 1989, she responded to a call from Cheryl. Elmore inter-

viewed Cheryl and C.K. The victim's statements to Elmore were substantially consistent with the her testimony at trial. C.K. told Elmore the abuse began the first time she visited defendant.

Pamela Klein, a psychotherapist, testified that she interviewed the victim at the request of the State's Attorney. Based solely on this interview, Klein determined that she had symptoms consistent with rape trauma syndrome. Klein explained that rape trauma syndrome is a subcategory of post-traumatic stress syndrome. According to Klein, rape trauma syndrome refers to a cluster of psychological symptoms common to victims of sexual assault.

Gary Swanson, an investigator with the Princeton police department, testified that he interviewed C.K. and Cheryl on July 19, 1989. At that time C.K. told Swanson that she had spent the summer of 1988 with defendant at his home in Princeton. She also told Swanson that during that summer she slept in defendant's bed most nights. C.K. described the incidents of sexual abuse and demonstrated using anatomically correct dolls. The descriptions were consistent with her trial testimony. She stated that the abuse occurred on three weekends in January 1989, including the weekends of December 31, 1988, January 14, 1989, and January 28, 1989.

Defendant's former girlfriend, Cathy Cannon, testified that she lived with defendant from June of 1986 through the fall of 1987. Cannon was present when C.K. first met defendant and during her subsequent trips between February and June of 1987. Cannon testified that the victim could not have slept in defendant's bed during these visits because, except for the first night in February, Cannon slept with defendant. Cannon testified that defendant was a good father who took an interest in his daughter's health, appearance and education. Cannon related an incident in which the victim admitted that, on

her mother's instructions, the victim lied to a landlord about whether she lived in an apartment with her mother.

Defendant testified that he met the victim at his nephew's wedding on February 14, 1987. From that time to the end of June 1987, the victim spent approximately every other weekend with defendant at his home in Princeton. The victim also spent the summer of 1987 with defendant and Cannon. Defendant testified that during this entire period he and Cannon were living and sleeping together. After the summer of 1987, defendant saw the victim occasionally, but she never spent the night alone with him. Defendant denied that the victim visited him in January 1989. Defendant denied that he ever had sexual contact with the victim.

Some time after the victim initiated contact with defendant, Cheryl and defendant resumed a relationship. Defendant stated that in early 1989 they were thinking about remarrying. However, according to defendant, after spending time together at Easter 1989, defendant ended that relationship. In May or June of 1989, defendant and Cheryl argued over a tax refund check which defendant believed had been garnished by Cheryl. Defendant later learned that Cheryl had nothing to do with the garnishment. During this argument defendant denied being the victim's father. When defendant subsequently called to speak with the victim, Cheryl stated the victim did not want to talk to defendant because of this comment.

Numerous alibi witnesses testified to defendant's whereabouts during each weekend in January 1989, and that the victim was not present at defendant's home at these times. Some of these witnesses' testimony was corroborated by business records. In addition, defendant's sisters and mother testified that on the weekend of January 22, 1989, defendant was visiting his step-father in a

hospital in Iowa City. Defendant's mother stated that defendant was at her home in Streator, Illinois, on the weekends of February 4 and February 12, 1989.

## II

We now consider defendant's argument that his expert should have been permitted to examine the victim to determine whether she suffered from rape trauma syndrome. Defendant argues that under the compulsory process clause of the sixth amendment and the due process clause of the fourteenth amendment, his expert should have been permitted to examine the victim. Because the compulsory process clause offers no greater protection than that afforded by the due process clause, we will consider this case under the latter provision. (See *Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 56, 94 L. Ed. 2d 40, 57, 107 S. Ct. 989, 1001.) A defendant's right to due process is the right to a fundamentally fair trial, including the right to present witnesses in his own behalf. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 294, 35 L. Ed. 2d 297, 308, 93 S. Ct. 1038, 1045.) "Few rights are more fundamental than that of an accused to present witnesses in his own defense." (*Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 312, 93 S. Ct. at 1049.) In this case the trial court did not preclude defendant from presenting his own expert witness. Rather, because defendant's expert was prevented from personally examining the victim the basis on which the expert could form an opinion was limited. In this manner the court's order restricted the ability of defendant's expert to form an opinion. We must now decide whether this restriction deprived defendant of a fair trial.

The relevant statutes provide:

"Sec. 115—7.1. Court may not order mental examination of sex victim. Except where explicitly authorized by this Code or by the Rules of the Supreme Court of Illi-

nois, no court may require or order a witness who is the victim of an alleged sex offense to submit to or undergo either a psychiatric or psychological examination." Ill. Rev. Stat. 1989, ch. 38, par. 115—7.1.

"§115—7.2. In a prosecution for an illegal sexual act perpetrated upon a victim, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961, testimony by an expert, qualified by the court relating to any recognized and accepted form of post-traumatic stress syndrome shall be admissible as evidence." (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.2.)

Defendant is not challenging the facial validity of either of these statutes. Instead, defendant contends that application of the two statutes together deprived him of a fair trial.

We begin with an examination of the legislative intent of the statutes. Section 115—7.1 was intended to protect sex-offense victims from the embarrassment of psychological examinations regarding the victim's competency and credibility as a witness. The protection afforded by section 115—7.1 was necessary because, until recently, sex-offense victims were subjected to increased scrutiny by the courts. The rationale for this higher scrutiny was grounded on the often quoted maxim that rape " 'is an accusation easily made, hard to be proved and still harder to be defended by one ever so innocent.' " *People v. Freeman* (1910), 244 Ill. 590, 594, quoting 3 S. Greenleaf, Evidence §212 (15th ed. 1892).

The suspicion to which victims of sexual assault were subjected was exemplified by the following passages found in Wigmore on Evidence:

"No judge should ever let a sex offense charge go to the jury unless the female complainant's social history and mental makeup have been examined and testified to by a qualified physician." 3A J. Wigmore, Evidence §924a, at 737 (Chadbourn rev. ed. 1970).

" 'We recommend that in all charges of sex offenses, the complaining witness be required to be examined before trial by competent psychiatrists for the purpose of ascertaining her probable credibility, the report to be presented in evidence.' " (3A J. Wigmore, Evidence §924a, at 747 (Chadbourn rev. ed. 1970), quoting ABA Committee on the Improvement of the Law of Evidence (1938).)

According to Wigmore, such examinations were necessary to determine whether the victim " 'suffers from some mental or moral delusion or tendency *** causing distortion of the imagination in sex cases.' " 3A J. Wigmore, Evidence §924a, at 747 (Chadbourn rev. ed. 1970), quoting ABA Committee on the Improvement of the Law of Evidence (1938).

Although Illinois did not adopt the extreme position advanced by Wigmore, Illinois courts had the discretionary power to order a sex-offense victim to submit to a psychological examination if the defendant presented a compelling reason for the exam. (*People v. Glover* (1971), 49 Ill. 2d 78, 82; *People v. Rossi* (1972), 52 Ill. 2d 13, 16.) No such power existed with respect to victims of nonsexual offenses. Thus, the victim's competency and credibility was open to attack based merely on the nature of the offense.

Section 115—7.1 was intended to eliminate the defense practice of intimidating sex-offense victims through psychological examinations focusing on their competency and credibility as witnesses. During debate on section 115—7.1, the legislature noted the disparity of treatment accorded victims of sex-offense crimes as compared to victims of non-sex crimes. (See 83d Ill. Gen. Assem., Senate Proceedings, May 23, 1983, at 144 (comments of Sen. Geo-Karis).) The legislature also expressed concern that defendants used court-ordered psychological examinations as a way to embarrass and intimidate sex-offense victims. (See 83d Ill. Gen. Assem., Senate Pro-

ceedings, May 23, 1983, at 143 (comments of Sen. Collins during Senate debate on Pub. Act 83—289, eff. Jan. 1, 1984).) By eliminating the defense tactic of requesting psychological examinations, section 115—7.1 places victims of sex crimes in the same position as victims of other crimes.

The issue addressed by section 115—7.2 is fundamentally distinguishable from the issue of the victim's competency and credibility as a witness. Section 115—7.2 permits the use of expert testimony relating to the existence of post-traumatic stress syndrome. Rape trauma syndrome is the subcategory of post-traumatic stress syndrome which is common to victims of sexual assaults. Unlike psychological evidence regarding the victim's competency and credibility as a witness, evidence of rape trauma syndrome is substantive evidence that a sexual assault occurred. By showing that a complainant suffers from psychological symptoms common to most victims of sexual assault, this evidence tends to support the proposition that the complainant was also the victim of a sexual assault.

Initially, the State argues that defendant has not presented a compelling reason for an examination of the victim. Thus, the State contends that defendant is not entitled to a court-ordered examination of the victim even without regard to section 115—7.1. The State's argument ignores the impact of its rape trauma syndrome evidence. As previously stated, this evidence tends to prove that the victim was subjected to a sexual assault. The fact that the State is using evidence of rape trauma syndrome to prove that the victim was assaulted presents a compelling reason for defendant to examine the victim.

Defendant is not attempting to challenge the victim's competency or credibility through a psychological examination. Instead, defendant is attempting to examine the

victim for the purpose of challenging the State's assertion that she suffers from rape trauma syndrome. Defendant argues that because he was denied the opportunity to counter the State's evidence with evidence of a substantially equal quality, he was deprived of a fair trial. Defendant points out that in an analogous situation, a defendant who asserts the insanity defense must either consent to a psychiatric examination by the State's expert witnesses or forgo the use of defense expert testimony based on the expert's personal examination of defendant. See Ill. Rev. Stat. 1989, ch. 38, par. 115—6.

The State does not dispute that defendant was entitled to present evidence that C.K. did not suffer from rape trauma syndrome. Rather, the State argues that defendant's expert witness could have formed an opinion on this subject by reviewing the various reports prepared in the case and observing the trial testimony of the victim and the State's expert, Pamela Klein. Because defendant was not completely prevented from offering evidence that C.K. did not suffer from rape trauma syndrome, the State argues that application of sections 115—7.1 and 115—7.2 did not deprive defendant of a fair trial. This argument ignores the inherent qualitative differences between testimony from an examining expert and a nonexamining expert.

While it may be possible for an expert to form an opinion regarding rape trauma syndrome based only on a review of reports and trial testimony, this is clearly not the preferred method. An expert who has personally examined a victim is in a better position to render an opinion than is an expert who has not done so. (See Note, *Defining the Boundaries of Admissible Expert Psychological Testimony on Rape Trauma Syndrome*, 1989 U. Ill. L. Rev. 691, 733 n.320 (stating that a personal examination is "a necessary prerequisite to diagnosing Rape

Trauma Syndrome or Post-Traumatic Stress Disorder").) Defendant argues that in-court observation by an expert would provide an inadequate basis for expert opinion because C.K.'s testimony would be constrained by the rules of evidence and defendant's expert would be unable to ask follow-up questions. Moreover, defendant points out that he would be placed in a strategic disadvantage if he were forced to wait until trial before his expert could evaluate the evidence of rape trauma syndrome. For example, defendant's expert might be unable to assist in the preparation of cross-examination of the State's expert and C.K. if he has not yet been able to form his own opinion regarding post-traumatic stress disorder. Finally, defendant argues in light of the fact he was indigent, he could not afford to pay the fees for an expert to attend the trial to observe the testimony of other witnesses plus testify himself.

The value of a personal examination is highlighted by Klein's testimony. Klein stated that she based her opinion on her own subjective interpretation of the victim's answers to questions and certain nonverbal factors. Klein indicated that examples of nonverbal factors include an inability to make eye contact and body posture during the interview. Further, Klein's testimony indicates that her reports did not include all of her observations of the victim. For example, Klein testified that C.K. cried throughout the interview although her report makes no mention of this. This testimony underscores the value of a personal examination in forming a psychological opinion.

Our system of criminal justice requires a complete presentation of the facts. As the Supreme Court stated:

> " 'We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and compre-

hensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.' " (*United States v. Nobles* (1975), 422 U.S. 225, 230-31, 45 L. Ed. 2d 141, 149, 95 S. Ct. 2160, 2166, quoting *United States v. Nixon* (1974), 418 U.S. 683, 709, 41 L. Ed. 2d 1039, 1064, 94 S. Ct. 3090, 3108.)

The need for a complete presentation of the facts is hampered by the interplay of these two statutes which restricts the defendant's ability to rebut the State's rape trauma syndrome evidence.

The inequity created by the interaction of sections 115—7.1 and 115—7.2 gives the State a clear advantage in its efforts to prove the victim suffers from rape trauma syndrome. Psychological testimony is often disputed and the value of an expert's opinion depends in large part upon the basis for that opinion. (See, *e.g., People v. Anderson* (1986), 113 Ill. 2d 1, 11 (" ' "expert opinion as to insanity rises no higher than the reasons upon which it is based" ' "), quoting *United States v. Harper* (5th Cir. 1971), 450 F.2d 1032, 1037.) Because the State in this case had the exclusive right to examine C.K., the credibility of its expert was elevated above that of any nonexamining expert defendant could call. Thus, we find it is fundamentally unfair that the State was able to present the testimony of an examining expert but the defendant was limited to the testimony of a nonexamining expert. See *Ake v. Oklahoma* (1985), 470 U.S. 68, 79, 84 L. Ed. 2d 53, 63, 105 S. Ct. 1087, 1094 ("a State may not legitimately assert an interest in maintenance of a strategic advantage over the defense,

if the result of that advantage is to cast a pall on the accuracy of the verdict obtained").

We hold that unless the victim consents to an examination by an expert chosen by the defendant, the State may not introduce testimony from an *examining* expert that the victim of an alleged sexual assault suffers from a "recognized and accepted form of post-traumatic stress syndrome" (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.2). Such an examination, if consented to, shall be conducted by an expert qualified by the court (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.2), and *shall be strictly limited to whether the victim has symptoms consistent with "any recognized and accepted form of post-traumatic stress syndrome."* (Emphasis added.) Any report generated by the defense expert's examination of the victim is discoverable by the prosecution. See 134 Ill. 2d R. 413(c).

We recognize the need to protect the privacy of the victims in cases of alleged sexual assault. (See *People v. Foggy* (1988), 121 Ill. 2d 337 (wherein this court found constitutional the provisions of section 8—802.1 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 8—802.1), which protect the confidentiality of communications between rape victims and rape crisis counselors).) Nothing in our opinion today requires a victim to consent to an examination by a defendant's expert. The victim is free to refuse for whatever reason. However, we must balance the victim's rights to be free from intrusion with the defendant's constitutional rights to a fair trial. Thus, where the victim exercises his or her right to refuse an examination, the State may not introduce evidence of rape trauma syndrome through the testimony of an examining expert. In any case, the State may still introduce rape trauma evidence through the opinions of nonexamining experts. We believe our decision today will protect the victim's rights by leaving the

ultimate decision on whether to undergo an examination with the victim.

We recognize, as did the legislature, that in the past defendants have used psychological examinations as a tool to harass, embarrass and intimidate victims of sexual assault. Such conduct is unacceptable and must not be tolerated by the courts. We believe the narrow scope of our holding combined with the fact that a defense expert's report is discoverable will help prevent such abusive tactics by defendants.

The State contends that even if defendant should have been given the opportunity to examine C.K., any error was harmless in light of the evidence of guilt. We cannot agree. The evidence in this case was closely balanced and ultimately the case turned on the credibility of the victim and defendant. The evidence of rape trauma syndrome tended to corroborate the victim's testimony. Because defendant was improperly prevented from challenging the rape trauma syndrome evidence, we cannot conclude that the jury would necessarily have returned a guilty verdict but for the trial error.

For the foregoing reasons, we reverse the judgments of the appellate and circuit courts and remand this cause to the circuit court for procedings consistent with this opinion.

*Judgments reversed;*
*cause remanded.*