# Illinois Official Reports

## Appellate Court

---

### *People v. Lerma*, 2014 IL App (1st) 121880

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDUARDO LERMA, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-12-1880 |
| Filed<br>Rehearing denied | September 8, 2014<br>October 8, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first degree murder, personally discharging a firearm that caused death, and aggravated discharge of a weapon in connection with a murder were reversed and the cause was remanded for a new trial on the ground that the trial court committed reversible error by denying defendant's motion to present expert testimony on the misconceptions commonly involved in evaluating identification testimony, since the record showed that the trial court failed to give proper consideration to the proffered testimony, especially when defendant alleged that his convictions stemmed from factors underlying these misconceptions, and the trial court was directed to allow the expert testimony subject to Rule 702 of the Illinois Rules of Evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-9899; the Hon. Timothy J. Joyce, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Linda Olthoff, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Simon and Liu concurred in the judgment and opinion.

## OPINION

¶ 1    A jury convicted defendant, Eduardo Lerma, of first degree murder, personally discharging the firearm that caused death, and aggravated discharge of a weapon in connection with the May 3, 2008, murder of Jason Gill. The only living eyewitness to the shooting, Lydia Clark, identified defendant. Clark and Jason Gill's father, Bill Johnson, both testified that a critically wounded Gill stated that defendant had shot him. Prior to trial, defendant sought to have an expert witness, Dr. Solomon Fulero, testify on eyewitness identification. The circuit court denied the motion, finding that because Clark, Gill, and defendant were acquaintances, expert testimony was not required. Shortly thereafter, Dr. Fulero passed away. During trial, defendant indicated to the court that he had secured a new expert witness, Dr. Geoffrey Loftus. He renewed his motion and submitted a report describing Dr. Loftus's anticipated testimony, which, unlike Dr. Fulero's report, directly addressed the effects of eyewitness identification when the eyewitness and the suspect are acquaintances. The circuit court denied the motion, relying on its reasoning as stated in its denial of Dr. Fulero's testimony. At issue is whether the circuit court abused its discretion when it denied defendant's motion to allow Dr. Loftus to testify regarding eyewitness identification testimony. We hold the circuit court abused its discretion because it did not carefully consider or scrutinize Dr. Loftus's anticipated testimony before denying defendant's motion.

¶ 2                              JURISDICTION

¶ 3    The circuit court sentenced defendant on May 23, 2012. Defendant timely filed his notice of appeal on June 6, 2012. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

BACKGROUND

The State charged defendant by indictment with first degree murder, aggravated discharge of a firearm, and unlawful use of a weapon by a felon for the May 3, 2008, shooting death of Jason Gill. At the time of the shooting, approximately 11:20 p.m., Gill and Lydia Clark were on Gill's front porch when defendant, whom she knew as "Lucky," allegedly approached the porch and shot at Gill and Clark. Clark dragged the critically wounded Gill into the house. Gill, in the presence of both Clark, and his father, Bill Johnson, who came onto the scene after hearing gunshots and Clark's screaming, stated that "Lucky" shot him. Gill and Clark are African-American while defendant is Hispanic.

Prior to trial, defendant filed a motion *in limine* to allow a licensed psychologist and attorney, Dr. Solomon Fulero, to testify as an expert witness on memory and eyewitness identification. Defendant argued that Dr. Fulero would assist the trier of fact with his specialized knowledge of information not commonly known by laypersons and that few jurors know the theory of memory within the field of psychology. Rather, jurors rely on many of the misconceptions of memory and eyewitness identification that Dr. Fulero would address. Defendant alleged that cross-examination of eyewitness testimony would appear insignificant to jurors due to their common misperceptions and lack of knowledge regarding memory and eyewitness identification.

Defendant attached Dr. Fulero's resume and a report showing Dr. Fulero anticipated testifying that the following factors present in defendant's case illustrate common misconceptions about eyewitness identifications: the confidence of the witness does not relate to accuracy; the reliability of an identification is reduced by stress or the presence of a weapon; the overestimation of time frames by an eyewitness; cross-racial identification problems; the forgetting curve and the effect of time on the reliability of an identification; the impact of partial disguises, such as a hood, on identification; "the effect of postevent information"; the problems associated with nighttime identification; and that multiple witness identifications and dying declaration identifications are not necessarily more reliable. Dr. Fulero would have also testified that the accuracy of eyewitness identifications could be reduced by police procedures utilized in this case. Defendant argued Dr. Fulero would have also addressed how common misconceptions of memory are in conflict with the theory of memory as generally accepted in the field of psychology.

Dr. Fulero reported that he also intended to testify as to the reliability of dying declarations. Specifically, that a dying witness's physical condition could contribute to a lie or mistake; that the dying witness's account may be truncated, incomplete, or one-sided due to the limited time to communicate; that, depending on the witness, such a witness may lie or extract revenge; and that the listener may miscomprehend the statement from a dying witness. Dr. Fulero also noted that "the factors that affect eyewitness reliability *** are just as present at the time of an event that involves a dying witness as one who is not dying."

In reply, the State stressed that Illinois courts had consistently upheld a trial court's decision to bar expert testimony concerning witness identification. The State considered Dr. Fulero's proposed testimony as within the common knowledge of the jury and would not aid it. The State argued that any identification issues defendant may have were better addressed by thorough cross-examination, closing argument, and jury instructions. The State found defendant's case to be factually distinguishable from Dr. Fulero's report because the

eyewitnesses[1] in this case knew defendant and identified him to the police by name, a fact Dr. Fulero failed to consider. The State also pointed out that defendant failed to cite any authority that would allow Dr. Fulero to testify regarding the reliability of dying declarations.

¶ 10 In a supplemental response, the State argued that Clark was the only eyewitness to the murder and knew defendant's nickname to be "Lucky." The State also pointed out that Dr. Fulero testified, in an unrelated case in Ohio, that the factors that lead to unreliable eyewitness identification were not applicable when the eyewitness knew the suspect.[2] The State maintained that because Clark and defendant were acquaintances, Dr. Fulero's testimony would not be relevant or have probative value.

¶ 11 Prior to oral argument on the matter, defense counsel sought to have Dr. Fulero testify at the hearing. The circuit court did not allow defendant to call Dr. Fulero to testify at the hearing. At oral argument on the motion, defense counsel disputed the State's argument that Dr. Fulero's testimony was not relevant because the witness knew defendant. Defense counsel argued that Dr. Fulero would testify that the witness and defendant knowing each other would just be another factor in his opinion and would not make his testimony irrelevant. Regardless, defense counsel argued the State would be able to impeach Dr. Fulero on this aspect of the case.

¶ 12 The State argued that Dr. Fulero's testimony does not apply to defendant's case due to the fact that the eyewitness knew defendant prior to the shooting, and knew him as "Lucky." The State disputed that dying declarations were unreliable and argued there was no precedent to support that theory.

¶ 13 The circuit court denied defendant's motion to allow expert witness testimony on eyewitness identification. It pointed out that the one fact that distinguishes this case from other identification cases is that the eyewitnesses knew defendant prior to the shooting, which it found negated the need for expert testimony. Specifically, the court found:

> "[I]t is not a circumstance that requires the testimony of an expert to establish what pretty much everybody knows, which *** it is a fact that persons *** are less likely to misidentify someone they have met or know or seen before than a stranger. That's not a function of psychology or expert opinion testimony. It is a function of human nature, and it is not something that would require the application of expert opinion testimony because it is not beyond the ken of an ordinary juror."

The court found two things to be prejudicial. First, it noted that Dr. Fulero's testimony tended "to generate *** a referendum on the efficacy of identification testimony generally"; and second, it could possibly lead to his voicing his opinion on the credibility of the eyewitnesses. The court also found Dr. Fulero's proposed testimony concerning the reliability of the dying

---

[1]Prior to trial, the circuit court referred to three eyewitnesses: Gill, Clark, and Gill's girlfriend, Jasmine Harris. The State, however, did not elicit testimony from Harris at trial and Clark testified that at the time of the shooting, she and Gill were alone on the front porch waiting for Harris to return home.

[2]The case of *State v. Nickleberry*, No. 77516, 2000 WL 1738356, at *3 (Ohio Ct. App. Nov. 22, 2000), contained the following statement in the body of its decision: "Solomon Fulero, Ph.D. who testified that eyewitness identification may be unreliable because of a variety of factors. He admitted, however, that these factors are considered applicable where the eyewitness is viewing a stranger and not someone he or she has met before."

declaration exception to the hearsay doctrine to be irrelevant because the preferred evidence from the deceased victim was an excited utterance.

¶ 14 The circuit court denied defendant's subsequent motion to reconsider and stressed that a distinguishing fact was that the eyewitnesses in this case knew defendant before the shooting. Prior to trial, defendant informed the court that Dr. Fulero had passed away. Defendant sought a continuance to seek a new expert witness to be used as an offer of proof, which the circuit court denied.

¶ 15 Midway through trial, defendant asked the court to reconsider its ruling on its expert witness. Defense counsel noted that it had secured a new expert witness, Dr. Geoffrey Loftus, after Dr. Fulero's death. Defense counsel provided a report from Dr. Loftus describing his anticipated testimony. In his report Dr. Loftus stated he reviewed police reports, witness statements and interviews, photo montages, lineup photos, and transcripts from court hearings in developing the report. Dr. Loftus stated he would discuss the general theory of perception and memory and how scientific evidence addressing the following topics related to eyewitness testimony: circumstances where memory fails; effects of low lighting; effects of distance on visual perception; effects of divided attention, including weapons focus; time durations and how people overestimate time durations in stressful or eventful circumstances; effects of cross-racial identification; effects of stress; consequences of a person's face being partially obscured; effects of expectations; consequences of nonindependent identifications; effects of suggestive postevent information; and the effect of the confidence of an eyewitness. Dr. Loftus stressed that he would not "issue judgments about whether a particular witness's memory and assertions *** are correct or incorrect." He noted that "any testimony on my part which implies unreliability on the part of eyewitness(es) who identify a defendant should *not*, *ipso facto*, be taken to imply that the defendant is innocent–it implies only that the eyewitness evidence should be viewed with appropriate caution." (Emphasis in original.)

¶ 16 Additionally, and unlike Dr. Fulero's report, Dr. Loftus anticipated discussing the implications of an eyewitness being acquainted with the identified person. Specifically, Dr. Loftus stated that "[i]t would seem intuitive to a jury that if a witness identifies a suspect with whom he or she is acquainted, the witness's identification would likely be accurate. However, this is not necessarily true." Dr. Loftus explained that "if circumstances are poor for a witness's ability to perceive a person," and "the situation fosters a witness's expectations that he or she will see a particular acquaintance[,] *** then the witness will tend to perceive the person as the expected acquaintance even if the person is in fact someone else." He noted those poor circumstances included low lighting; viewing longer distances in the dark; divided attention of the witness, including a focus on a weapon; time duration, with less time leading to less available information, and a witness's tendency to overestimate time durations; cross-racial identification; stress; and a partially obscured face. Dr. Loftus stated such situations may lead to misidentification because:

> "In such circumstances, the witness's acquaintance with the expected–and hence perceived–person works against accurate identification for two reasons: First, it would be natural and easy for the witness to subsequently pick the acquaintance in an identification procedure *** (because the witness already knows whom she is seeking in a lineup procedure, she could immediately rule out all the fillers, and zero in on the acquaintance/suspect). Second, the witness could use his or her prior knowledge of the acquaintance's appearance to reconstruct his or her memory of the original events–the

crime–such that the in fact poor original memory of the actual criminal is replaced with a stronger and more confidence-evoking memory of the acquaintance \*\*\*."

¶ 17    The State maintained that expert testimony was not needed because Clark knew defendant before the shooting.

¶ 18    The circuit court noted it reviewed Dr. Loftus's report and resume, but denied the motion for reasons "consistent with the reasons [it] set forth in detail when [it] made the ruling on [defendant's] similar motion with respect to Dr. Fulero."

¶ 19    At trial, Jason Gill's mother, Delma Johnson, testified she had known defendant three or four years. She knew him as "Lucky," but did not know his real name. She testified he would come over every weekend and was friends with Gill. Approximately one week before the shooting, she observed defendant arguing with a member of her family, Mekyell Bynum.

¶ 20    Lydia Clark testified at the time of the shooting, she was 17 years old. She also knew defendant as "Lucky," and estimated she had seen him on the porch of the house across the street approximately 10 times prior to the shooting. She did not know his real name and had never spoken with him or been in the same house with him. At approximately 11:20 p.m. on the day of the incident, she and Gill were sitting on the front steps of Gill's house. The streetlights were on. She saw defendant wearing all black with a hooded sweatshirt with the hood down. Defendant pointed a black gun toward her and Gill and shot it two to five times. Gill covered her with his arms. Gill fell and Clark dragged him into the house through the door. She called the police and heard Gill's father, Bill Johnson, come downstairs. Johnson asked Gill who shot him and Gill stated " ' Lucky shot me.' " Gill's voice sounded "[l]ike he was gasping for air." She told the two police officers who first responded to the scene what had happened. That next morning, at 1:25 a.m., she went to the police station, where she was shown six photographs of Hispanic males, one of which was defendant. She identified defendant from the photographs as the shooter. On May 5, 2008, she identified defendant at the police station.

¶ 21    On cross-examination, Clark testified that although she had seen defendant, she "did not know him." She admitted that she testified before the grand jury, on May 9, 2008, several days after the shooting, that she had only seen defendant once or twice before the shooting. She also admitted that on or about May 4, 2008, she told Detective Hughes that she had known defendant for a couple of months. She testified she had never had a conversation with defendant prior to the shooting. She denied that she told Detective Hughes shortly after the shooting that defendant's hood on his sweatshirt was up at the time of the shooting. She agreed that when the shooter approached she saw the gun; she felt fear and wanted to get out of the way. The gun was already in the shooter's hand. Gill's house did not have a front porch light. The shooter came from across the street in front of an abandoned house. She testified that there were no lights on in the yard of the abandoned house. Clark testified that she told the officers that responded to the shooting that defendant shot Gill and that defendant had been in a feud with Gill's family. When she identified defendant at the police station in the holding cell, he was alone.

¶ 22    Bill Johnson, Gill's father, testified consistently with Clark's testimony concerning Gill's statement that "Lucky" had shot him. Bill Johnson thought the fight between Mekyell Bynum and defendant "was supposed to be over." In cross-examining Clark and Johnson, defendant played a recording of Clark's 911 call made after the shooting and provided a transcript of the call. Johnson's voice and a conversation he had with Clark were on the recording. Johnson told

the operator on the call that Gill could not talk. The recording did not reflect that Johnson asked Gill who shot him.

¶ 23    Chicago police officer John Layne testified he responded to the scene of the shooting and found Clark "in shock." He testified that "All [Clark] could say basically to us was Lucky shot him. He just walked up and shot him." She later told Officer Layne that "Lucky," who was Hispanic, aged 23 to 28, and lived on the block, shot Gill. When Officer Layne arrived on the scene, Gill was unable to speak.

¶ 24    Detective Thomas Benoit of the Chicago police testified he assembled a photo array, which included defendant and five others, to show to Lydia Clark. When shown the photo array, Clark identified defendant as the shooter. On cross-examination, Detective Benoit testified the photos of the people in the array other than defendant were generated from a computer.

¶ 25    Kurt Zielinski, a forensic scientist with the Illinois State Police, admitted on cross-examination that he did not find any physical evidence linking defendant to the shooting. Similarly, Detective James Las Cola, who reported to the scene shortly after the shooting, testified that he did not find any firearm evidence on the scene.

¶ 26    Detective Halloran testified that on May 5, 2008, in the early morning, Lydia Clark told him that "Lucky" shot Gill. Detective Halloran did a "show-up" identification procedure whereby defendant stood alone in a room. Clark, looking through a window, identified defendant as the shooter. He explained he did a "show up" identification procedure as opposed to a lineup because Clark knew the shooter beforehand.

¶ 27    Detective Michael Hughes testified he interviewed Lydia Clark, who told him that a person wearing a black, hooded sweatshirt with the hood up approached her and Gill and fired a gun at them. Clark indicated to Detective Hughes that she had known the shooter a couple of months. On cross-examination, Detective Hughes testified Clark told him Lucky was the shooter. She also described defendant as a "5/6 or 5/9" white male in his twenties weighing approximately 160 pounds.

¶ 28    Taurhern Gill, the victim's brother, testified that an hour or two before the shooting, he was in the alley directly behind his house when he saw Salvador Rojas with a gun in his hand. On cross-examination, he testified he had known defendant five or six years and that defendant did not look like Rojas. He had seen Rojas in the past with defendant in the house across the street from his house. On redirect examination, he testified that both defendant and Rojas are light-skinned Hispanics.

¶ 29    Sergeant Calvin Williams testified he spoke with Bill Johnson, the victim's father. Johnson did not tell Williams that his son told him anything about the shooting. He did tell Williams that a family member had an altercation with defendant the previous Wednesday or Thursday. He also said that defendant had been hanging around the block that day.

¶ 30    Dr. Humilier performed the autopsy on Jason Gill's body and testified Gill died from homicide due to multiple gunshot wounds. On cross-examination, Dr. Humilier testified he found cocaine present in Gill's body, but he could not make a judgment on when Gill had used cocaine.

¶ 31    The parties stipulated that Lydia Clark testified before the grand jury that Gill crawled into the house, as opposed to Clark dragging him into the house. The parties further stipulated that the three streetlights on the block were properly functioning on May 3, 2008. The parties

stipulated that an expert in astronomy would have testified that on May 3, 2008, the moon was not visible in the sky at 11:20 p.m.

¶ 32    After trial, defendant filed a motion for new trial arguing, in relevant part, that the circuit court erred in not allowing him to present expert witness testimony regarding the reliability of eyewitness testimony. The circuit court sentenced defendant to 45 years' imprisonment.

¶ 33                                    ANALYSIS

¶ 34    Defendant argues the trial court erred in excluding expert testimony addressing misconceptions commonly involved in evaluating identification testimony where his conviction stemmed from factors underlying those misconceptions. According to defendant, the circuit court relied on a common misconception of eyewitness testimony, *i.e.*, that such identification by a prior acquaintance is reliable, which his expert witness's report directly disputed. Defendant maintains that this error is reversible error because the preclusion of the evidence directly impacted the jury's verdict. In response, the State argues the circuit court acted properly within its discretion in denying defendant's motion. Specifically, the State argues the circuit court conducted a meaningful inquiry before denying the motion. The State maintains any error made by the circuit court here was harmless because defense counsel managed to elicit any relevant point that his proposed expert witness would have covered by way of cross-examination and closing argument.

¶ 35    A criminal defendant's right to due process and a fundamentally fair trial includes the right to present witnesses on his or her own behalf. *People v. Wheeler*, 151 Ill. 2d 298, 305 (1992). "In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288 (1990). Expert testimony addressing matters of common knowledge are not admissible "unless the subject is difficult to understand and explain." *People v. Becker*, 239 Ill. 2d 215, 235 (2010). In addressing the admission of expert testimony, the trial judge should balance the probative value of the evidence against its prejudicial effect to determine the reliability of the testimony. *Enis*, 139 Ill. 2d at 290. Furthermore, the necessity and relevance of the expert testimony should be carefully considered in light of the facts of the case. *Id.*; *People v. Tisdel*, 338 Ill. App. 3d 465, 468 (2003) ("Trial courts should carefully scrutinize the proffered testimony to determine its relevance–that is, whether there is a logical connection between the testimony and the facts of the case."). Relevant and probative testimony should be admitted, whereas misleading or confusing testimony should not be admitted. *Tisdel*, 338 Ill. App. 3d at 468. When determining the reliability of an expert witness, the trial judge is given broad discretion. *Enis*, 139 Ill. 2d at 290. Therefore, we review the trial court's decision to admit evidence, including expert witness testimony, for an abuse of that discretion. *Becker*, 239 Ill. 2d at 234. Arbitrary, fanciful, or unreasonable decisions by the trial court constitute an abuse of discretion. *Id.*

¶ 36    The trial court here ruled that Dr. Fulero's testimony was not needed principally because Clark and Gill knew defendant before the shooting. The court found that "it is a fact that persons who are less likely to misidentify someone they have met or know or seen before than a stranger." After Dr. Fulero's death, defendant secured a new expert witness, Dr. Loftus. Defendant renewed his motion to call an expert witness and submitted Dr. Loftus's report and resume. Dr. Loftus's report, unlike Dr. Fulero's, directly addressed the implications of an

eyewitness being acquainted with the identified person. Specifically, Dr. Loftus noted that factors present in the case at bar such as low lighting, darkness, presence of a weapon, cross-racial identification, stress, and partially obscured face[3] could lead to an eyewitness misidentifying an acquaintance. Dr. Loftus explained that "it would be natural and easy for the witness to subsequently pick the acquaintance in an identification procedure," and that "the witness could use his or her knowledge of the acquaintance's appearance to reconstruct *** her memory of the original events." The trial court, despite Dr. Loftus directly addressing problems associated with eyewitness identification of an acquaintance, denied defendant's renewed motion to call Dr. Loftus for reasons consistent with its prior ruling. Both our supreme court and this court have stressed that expert testimony should be carefully considered and scrutinized in light of the facts of the case. *Enis*, 139 Ill. 2d at 290; *Tisdel*, 338 Ill. App. 3d at 468 ("Trial courts should *carefully scrutinize* the proffered testimony to determine its relevance–that is, whether there is a logical connection between the testimony and the facts of the case." (Emphasis added.)). It is clear that the trial court here, in relying on its prior reasoning, did not carefully consider or scrutinize Dr. Loftus's report where the report directly contradicted the court's prior finding that it is common knowledge that an eyewitness is less likely to misidentify an acquaintance.

¶ 37     We find this court's decision in *People v. Allen*, 376 Ill. App. 3d 511 (2007), to be instructive here. In *Allen*, this court held that the trial court abused its discretion when it failed to scrutinize, weigh, or consider relevant proposed testimony from the report of an expert on eyewitness identification. *People v. Allen*, 376 Ill. App. 3d 511, 521-26 (2007). This court explained:

> "No careful scrutiny took place in this case. Relevance of the different parts of [the] proposed testimony was not seriously considered. Nor their weight. *** The balancing test requires a weighing of 'probative value against its prejudicial effect.' [Citation.] The test cannot be accomplished without an inquiry into the probative value of the proposed testimony and its relevance to the issues in the case. It is then that the inquiry shifts to the risk of unfair prejudice ***." *Id.* at 526.

This court in *Allen* concluded that the "failure to conduct a meaningful inquiry" into the proposed testimony was reversible error. *Id.* In the case at bar, we cannot say that any meaningful inquiry took place where the circuit court denied Dr. Loftus's proposed testimony based on the same reasoning it applied to Dr. Fulero's proposed testimony, even though Dr. Loftus's report directly contradicted that reasoning. As in *Allen*, the trial court's failure here to carefully scrutinize Dr. Loftus's anticipated testimony, as stated in his report, constituted an abuse of discretion.

¶ 38     We also find it difficult to accord the customary degree of deference to the trial court's discretion in this case because the trial court, in relying on its prior ruling, explained itself with little more than a series of conclusions based on its personal belief. The trial court found "everybody knows" that eyewitnesses are less likely to misidentify an acquaintance, describing it as "a function of human nature." As discussed above, Dr. Loftus directly contradicted these statements in his report, stating such sentiments are "not necessarily true,"

---

[3]Conflicting evidence regarding whether the shooter's hood on his sweatshirt was up or down was presented at trial. Clark testified the hood was down while Detective Hughes testified Clark told him shortly after the shooting that the hood on the shooter's sweatshirt was up.

especially when various circumstances were present, many of which were present in the case at bar. The circuit court further feared such testimony would "generate *** a referendum on the efficacy of identification testimony generally" and that the expert could voice his opinion on the credibility of witnesses. Dr. Loftus also addressed these fears in his report, stating that when testifying, he does not "issue judgments about whether a particular witness's memory and assertions in the case at hand are correct or incorrect." He further noted that "any testimony on my part which implies unreliability on the part of eyewitness(es) who identify some defendant should *not*, *ipso facto*, be taken to imply that the defendant is innocent–it implies only that the eyewitness evidence should be viewed with appropriate caution." (Emphasis in original.) The circuit court's reliance on its previous ruling, despite being addressed and contradicted by Dr. Loftus's report, highlights the need for careful scrutiny of proposed expert testimony. Accordingly, we hold the trial court's injection of its subjective value judgments and exercise of judicial protectionism for the State renders its denial of defendant's expert witness an abuse of discretion.

¶ 39 We acknowledge that courts in Illinois and around the country have recognized that scientific studies have shown significant errors in eyewitness identifications and that the public have misconceptions of eyewitness identification. *Allen*, 376 Ill. App. 3d at 523; *Tisdel*, 338 Ill. App. 3d at 467; *United States v. Brownlee*, 454 F.3d 131, 141-43 (3d Cir. 2006); *United States v. Smithers*, 212 F.3d 306, 311-12 (6th Cir. 2000); *State v. Lawson*, 291 P.3d 673, 684-90 (Or. 2012); *State v. Cheatam*, 81 P.3d 830, 840-41 (Wash. 2003); *State v. Henderson*, 27 A.3d 872, 877 (N.J. 2011). The advent of DNA testing, particularly in postconviction reviews, has shown a significant percentage of conviction reversals involve eyewitness identifications that turn out to be false. Studies have shown that erroneous identification accounted for as much as 85% of the convictions later exonerated by DNA testing. Jacqueline McMurtrie, *The Role of the Social Sciences in Preventing Wrongful Convictions*, 42 Am. Crim. L. Rev. 1271, 1271-75 (2005). The current state of the law in Illinois requires that the trial court carefully consider and scrutinize proposed expert eyewitness identification testimony. *Enis*, 139 Ill. 2d at 290 (holding that the necessity and relevance of the expert testimony should be carefully considered in light of the facts of the case); *Tisdel*, 338 Ill. App. 3d at 468 ("Trial courts should carefully scrutinize the proffered testimony to determine its relevance–that is, whether there is a logical connection between the testimony and the facts of the case."). The trial court here did not do so and failed to give Dr. Loftus's report the proper consideration required before denying his proffered testimony.

¶ 40 We also hold the trial court's failure to give Dr. Loftus's report proper consideration before denying his proffered testimony is reversible error. When determining whether an error is harmless, "a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Becker*, 239 Ill. 2d at 240. Here, we hold the error contributed to defendant's conviction. The State did not present any physical evidence linking defendant to the crime. Clark's eyewitness testimony was only corroborated with a hearsay excited utterance. Dr. Loftus's testimony addressing common misconceptions associated with eyewitness testimony, especially testimony whereby an eyewitness identifies an acquaintance under the circumstances present in this case, would have assisted the jury in reaching its conclusion. Failure to allow Dr. Loftus's relevant and

probative testimony therefore contributed to the jury's verdict. Accordingly, we reverse defendant's conviction and remand the matter for a new trial with directions to allow expert testimony on eyewitness identification subject to the provisions of Rule 702 of the Illinois Rules of Evidence (eff. Jan. 1, 2011).

¶ 41    We note that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. This finding removes the risk of subjecting defendant to double jeopardy. See *People v. Taylor*, 76 Ill. 2d 289, 309-10 (1979).

¶ 42                                              CONCLUSION

¶ 43    For the reasons stated, we reverse defendant's conviction and remand the matter for a new trial with directions.

¶ 44    Reversed and remanded with directions.