# Illinois Official Reports

## Appellate Court

*People v. Anderson*, 2017 IL App (1st) 122640

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT ANDERSON, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-12-2640 |
| Rule 23 order filed | September 27, 2016 |
| Rule 23 order withdrawn | January 27, 2017 |
| Rehearing denied | January 27, 2017 |
| Opinion filed | January 31, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-CR-7356; the Hon. Kenneth Wadas, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Stephen L. Richards, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Jeffrey Allen, Matthew Connors, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |

Panel                    JUSTICE PIERCE delivered the judgment of the court, with opinion. Presiding Justice Hyman and Justice Mason concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Robert Anderson was convicted of four counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) related to the shooting deaths of Moises Reynoso and Robert Lilligren. Defendant was subsequently sentenced to life in prison. Defendant now appeals and raises eight issues: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred in admitting hearsay testimony; (3) the trial court erred by precluding defense counsel from questioning Officer Jeong Park as to whether he would describe defendant as "black"; (4) the trial court erred when it excluded evidence of defendant's prior acquittal for an unrelated charge; (5) the trial court erred in denying defendant's motion *in limine* for expert testimony on eyewitness identification; (6) the trial court abused its discretion in denying defendant's motion for new trial in light of allegedly newly discovered evidence; (7) the prosecutor's remarks in closing argument were prejudicial and denied defendant a fair trial; and (8) the trial court erred in denying his request for a new trial based on his allegations of ineffective assistance of counsel. For the following reasons, we affirm the judgment of the trial court.

¶ 2                         BACKGROUND

¶ 3    On March 6, 2003, Moises Reynoso and Robert Lilligren were shot to death as they sat in a vehicle in the parking lot behind Leader Liquors, just north of the intersection of Irving Park Road and Sacramento Avenue in Chicago.

¶ 4    Shortly before midnight on March 5, 2003, Chicago police officers Paul Sedlacek and Jeong Park received a call requesting a well-being check on the attendant of the Clark Gas Station at the intersection of Sacramento Avenue and Irving Park Road. The officers arrived at the gas station in less than a minute. As the officers got out of their car, they heard gunshots coming from a parking lot on the west side of Sacramento Avenue across from the gas station.

¶ 5    Officer Sedlacek heard five or six shots initially. The shots came from the center of the parking lot behind Leader Liquors where a silver car was parked. A man, who was later identified as defendant, was standing near the rear passenger's side, next to the trunk, firing approximately five shots into the vehicle. Defendant then moved around the back of the vehicle, stood next to the tire on the driver's side, and fired one shot at the driver who appeared to be trying to exit the vehicle. Defendant was 60 to 65 feet away from the officer in a well-lit area. There was a six-foot-tall chain link fence between Officer Sedlacek and defendant, but he could easily see through it. Officer Sedlacek saw defendant's face but not clearly enough to make an identification. Officer Sedlacek testified defendant was wearing a dark jacket and dark pants. Reynoso was the driver of that car, and Lilligren was the passenger.

¶ 6       After firing the last shot at Reynoso, defendant ran east along the alley toward the gas station where the officers were. A chain link fence enclosed the area, and the officers had to find a hole in the fence so that they could access the alley. The officers also ran east, parallel to defendant, until they found the opening in the fence, at the far northeast corner of the gas station parking lot. The officers had to run around the mini-mart, which was about 20 feet wide, and could not see the defendant while he was behind it.

¶ 7       When defendant ran past the officers, he turned his head and looked at them. Officer Sedlacek was able to see defendant's face from approximately 10 to 15 feet away for about a second. Defendant's hood had fallen from his head when he turned, giving Officer Sedlacek and Officer Park a full-frontal view of his face. There were street lights in the alley. Officer Park also saw the defendant was wearing gloves and holding a gun in his right hand. Officer Park radioed that defendant was running eastbound in the alley north of Irving Park Road. Defendant had a gun in his right hand. Officer Sedlacek testified that he "fixated on that gun [and] did not observe his left hand." Officer Sedlacek testified that at the time of the shooting, he recognized defendant's face but could not remember his name.

¶ 8       The officers chased defendant east through the alley to Richmond Street, where defendant turned north. By the time he turned, defendant was 25 to 30 feet in front of Officer Sedlacek and about 15 feet ahead of Officer Park, who saw defendant heading east into a gangway about mid-block on Richmond Street. When the officers reached Richmond Street, they heard "panicked shrieking" that was "[e]xtremely loud, as loud as someone could shriek." The officers turned around and ran back to where the shrieking came from. When they arrived back at the scene of the shooting they found Roberta Stiles screaming "my cousin, my cousin." Officer Park broadcasted defendant's description over the police radio as a "male black, [wearing] all black—or all dark clothing." Officer Park testified that in the "heat of the moment, I saw a person wearing all black, running eastbound, carrying a gun. That's what I went [with] on the air."

¶ 9       The officers observed Reynoso, the driver of the car, lying on the ground next to the car, bleeding from a gunshot wound to the head. He was pronounced dead at the scene. Lilligren, who was seated in the passenger's seat of the vehicle, was also bleeding. Officer Sedlacek testified that he recognized Officer Reynoso from previous interactions.

¶ 10      Chicago police officer Joseph Castillo arrested defendant about four minutes after Officer Park and Officer Sedlacek stopped chasing him. He was apprehended by Officer Castillo after a foot chase through a gangway and a parking lot. During the chase, Officer Castillo saw defendant throw something down, which he recovered and identified as a pair of black gloves. Along with the gloves, Officer Castillo recovered a checkbook that did not bear defendant's name.

¶ 11      Approximately 15 minutes after the shooting, defendant was placed in a squad car and brought back to the scene. Officer Sedlacek was instructed to look inside the car to see if he could identify defendant as the shooter. Officer Sedlacek "looked inside, the offender looked at me, I said, 'Yes, that's the person I saw shoot.'" After Officer Sedlacek identified defendant as the shooter, defendant vomited in the car. Officer Park viewed defendant in the back of the police car separately and also identified defendant as the shooter. Defendant again vomited after he was identified as the shooter by Officer Park.

¶ 12      Officer Sedlacek testified that he recognized the defendant but could not initially recall his name. He later discovered that he had arrested defendant, along with Reynoso and Terry

Hill, in an unrelated case in July 2001. Officer Sedlacek testified and identified defendant at the trial for defendant's unrelated case, which took place a little less than a year before the shooting in this case. He knew defendant as "Nookie." Officer Sedlacek also identified photographs of Hill, whom he knew as "Terry," and a photograph of Jesus Quinones, whom he knew as "Blood." He stated he saw defendant, Reynoso, and Hill in the early morning hours of July 1, 2001, when he arrested all of them for aggravated battery in an unrelated incident. Officer Sedlacek testified that during the prior investigation he was face-to-face with defendant several times and was within several feet of defendant for about two hours in a lit police station.

¶ 13    Between the time Officer Sedlacek observed the shooting and the show-up identification of defendant, he did not report on the radio that the shooter was defendant or that the shooter was nicknamed "Nookie." He did not tell the superior officers at the scene that he knew defendant and had previously arrested him. Officer Park also testified that Officer Sedlacek never indicated that he knew defendant from a previous arrest.

¶ 14    In Officer Sedlacek's incident report, he listed himself and Officer Park as people who discovered and reported the crime but did not check the box indicating they witnessed the crime. Officer Sedlacek wrote that he "saw an individual standing next to a silver car, firing a handgun into the vehicle," and that person was "a male black in his 20's wearing a dark jacket." The report did not include the fact that Officer Sedlacek saw the front of the man's face as he was running past the officers in the alley. The report also did not include that the man was wearing gloves and did not detail that the man was "wearing a parka with the hood up and fur trim around the hood." Officer Sedlacek did not include the information that the man stood near the rear passenger's side tire or that he looked both ways before firing the last shot. The additional information that defendant had vomited after he was identified as the shooter was also not included in Officer Sedlacek's report.

¶ 15    Officer Castillo testified he was on duty on March 6, 2003. Officer Castillo was working alone, in uniform, and driving an unmarked squad car. Just after midnight, Officer Castillo heard a radio call announcing shots fired near the intersection of Sacramento Avenue and Irving Park Road. The description given was "male black in all dark clothing." He then heard Officer Park make another radio call stating "731, we lost him in the alley, one block east of the gas station. If someone can secure our car, well, it's the gas station lot, when we heard the victim screaming." Officer Castillo was only a few blocks away. He drove down California Avenue to Belle Plaine Avenue, one block north of Irving Park Road. He stopped, walked west on Belle Plaine Avenue until he reached the north-south alleyway between California Avenue and Mozart Street, and walked south through the alley.

¶ 16    Defendant then ran out from an east-west gangway at 4035 North Mozart Street into the alley where Officer Castillo was walking. Officer Castillo was approximately 10 feet away from defendant when he came out of the gangway. Defendant was wearing dark clothing, a "[b]lack parka type jacket." Defendant fit the description Officer Castillo heard over the radio. Officer Castillo yelled at defendant to stop and announced "police," but defendant continued running. When Officer Castillo first saw defendant, he did not notice if defendant had anything in his hands.

¶ 17    Officer Castillo chased defendant, who ran onto California Avenue. Defendant ran south through a parking lot located on the northwest corner of California Avenue and Irving Park Road and was stopped by another police car. As the police car was approaching, Officer

Castillo saw defendant throw a pair of black gloves, which he later recovered. Officer Castillo then placed defendant into custody. Officer Castillo also recovered a checkbook that was found next to the gloves. The checkbook was not in defendant's name, and Officer Castillo did not see it drop from defendant's hands. Officer Castillo put the gloves and checkbook in his pocket and later turned them over to the evidence technicians. Officer Castillo showed Chicago police sergeant Rick Nigro the gangway that he saw defendant run out of.

¶ 18    Sergeant Nigro then drove to the scene of the shooting and attempted to retrace defendant's steps from the shooting to the gangway. Sergeant Nigro walked east from the scene of the shooting through the alley where the radio broadcast had reported defendant was running. He conducted a systematic search of the gangways and alleyways and looked for footprints in the snow. He searched for approximately one hour and eventually "saw some footprints on the side of [a] garage," which led him to search for a gun in that area. The garage was located at 4036 North Mozart Street. Sergent Nigro climbed to the second level of a neighboring porch so he could see the roof of the garage. From the higher vantage point, he could see "a hole in the snow" in the middle of the roof. He called for a ladder, climbed on top of the roof, and found a semiautomatic handgun.

¶ 19    Chicago police forensic investigator Jim Shadir and his partner, Arthur Oswald, photographed the gun as it was found and then inventoried the weapon. The gun was a black .40-caliber Beretta model 8040 Cougar F, which had a defaced serial number. The gun was in slide lock, which meant that all the bullets that were in the weapon had been expended. Investigator Shadir also recovered an empty black .40-caliber Smith and Wesson magazine from the gun. There were no latent fingerprints on the gun, the magazine, or the cartridge cases.

¶ 20    Investigators Shadir and Oswald also processed the scene of the shooting at approximately 12:53 a.m. Investigator Shadir photographed the crime scene and recovered one .40-caliber Smith and Wesson cartridge case on the ground in the snow near the driver's side door of the vehicle and five .40-caliber Smith and Wesson cartridge cases on the ground in the snow near the passenger's side of the vehicle. Shadir inventoried the cartridge cases to be submitted for forensic analysis. While at the scene, he also received a pair of black gloves and a checkbook from Officer Castillo, which he inventoried for analysis. Investigator Shadir then went to the hospital where Lilligren was taken and recovered and inventoried Lilligren's jacket.

¶ 21    Dr. John Scott Denton, former Cook County medical examiner, performed an autopsy on Lilligren and stated that he been shot three times. None of the gunshot wounds were close range. Dr. Denton concluded that Lilligren was struck by at least two, possibly three, different gunshots and concluded that the gunshot wound to the back of Lilligren's head caused his death. The manner of death was homicide.

¶ 22    Dr. Denton reviewed the autopsy of Reynoso. Reynoso suffered 11 gunshot wounds. Three bullets were recovered from his clothing, and two more bullets were recovered from his body. Each of the bullets was inventoried. None of the gunshot wounds were at close range. The first gunshot wound was located in Reynoso's chest, on the right side. A second gunshot wound was located at the left lateral chest, and a third gunshot wound was just below the second at the left lateral chest. A fourth gunshot wound was located at the right side of Reynoso's back, just below the shoulder blade. A fifth gunshot wound was located in

his back and entered through the eleventh rib on the right side. A sixth gunshot wound was the result of a bullet that went through the right chest and exited through the abdomen. A seventh gunshot wound was located in the right forearm. An eighth gunshot wound was located on the left hand, which had numerous injuries on the palm and fingers, which were classified as defensive wounds. A ninth gunshot wound, a graze, was located at the left upper arm. A tenth gunshot wound was located at the back left of Reynoso's head. This bullet traveled through the scalp, bone, and brain and lodged in the bone behind the left ear. Dr. Denton determined that Reynoso died from multiple gunshot wounds, and the manner of death was homicide. The location of the gun relative to the victims' bodies could not be determined, only the course the bullet took once it had entered the bodies. It was Dr. Denton's opinion that some of the bullets fired at Reynoso may have caused more than one wound.

¶ 23    Chicago police forensic investigator Steven Duffy went to the medical examiner's office on March 6, 2003, and received an envelope containing the bullets recovered from Reynoso's body. Investigator Duffy then submitted those bullets for forensic testing.

¶ 24    Forensic scientist Kurt Zielinski specializes in firearms identification for the Illinois State Police lab and supervised the testing performed on the recovered firearm, magazine, cartridge casings, and bullets. The firearm and magazine were capable of holding 11 bullets, 10 in the magazine and 1 in the chamber of the firearm. Forensic testing revealed that all six of the cartridge cases found next to the vehicle and all five bullets recovered from the victims' bodies and clothing were fired from the same gun found by Sergeant Nigro on the garage roof.

¶ 25    Forensic scientist Mary Wong specializes in trace chemistry for the Illinois State Police lab. Wong tested the black knit gloves for gunshot residue. One glove tested positive for the presence of gunshot residue. The other glove "had two unique particles and some consistent particles" but not enough to make a positive finding. Defendant's coat was tested for gunshot residue and samples taken from the cuffs of both sleeves revealed "they both contained particles of background samples which [led] to a conclusion that the sample areas may not have been in the vicinity of a discharged firearm" but the samples taken from the jacket did not test positive for the unique particles of gunshot residue. Wong testified that the absence of gunshot residue may have been the result of particles having been removed by activity. Wong stated that wind, moisture, and friction from brushing up against something could all remove gunshot residue or prevent it from being deposited. Wong added that a difference in fabric may also account for gunshot residue being deposited on one item but not another. The absence of gunshot residue was only on the specific areas tested, and it could not be concluded that there was a complete absence of gunshot residue on defendant's jacket.

¶ 26    Lorena Reynoso, Reynoso's sister, testified that approximately 10 days before the shooting, she was home with Reynoso in the evening and there was a knock at the door. She answered the door and saw defendant with two people she knew as "Blood" and "Terry." Lorena knew defendant by the nickname "Nookie." Lorena had known defendant for three years and had lived with him and his family for approximately three months in 2000. Defendant asked Lorena where Reynoso was. Lorena then had a conversation with Reynoso, after which she returned to the door and told defendant and the other two men that Reynoso was not home, so they left. Defendant had previously come to the house looking for Reynoso on five to seven separate occasions, beginning in November or December 2002. A few of

those times defendant came with "Blood" and "Terry." Each time defendant came looking for Reynoso, it was approximately 7 p.m. Prior to late 2002, Reynoso and defendant had been friends and spent time together every day. They stopped spending time together around November or December 2002.

¶ 27    Reynoso and Lorena had another brother, Renee, who was also friends with defendant. Renee also stopped spending time with defendant in November or December 2002. When defendant came by asking for Reynoso, he did not ask for Renee.

¶ 28    Lorena testified that she did not tell anyone about these visits until January 2005, when she was interviewed by Assistant State's Attorney Brogan and a State's Attorney investigator about an unrelated case. At the time Lorena was on probation for concealing a fugitive, an ex-boyfriend. Additionally, two of her ex-boyfriends had been charged with murder, one of which was the fugitive Lorena was charged with concealing.

¶ 29    After the State rested, the court denied defendant's motion for a directed verdict.

¶ 30    Roberta Stiles testified on defendant's behalf. Stiles was Lilligren's aunt. She testified that before midnight on March 5, 2003, she saw Lilligren on Irving Park Road near the intersection of Francisco Avenue. She and Lilligren went to a friend's house to eat and then went to the gas station on Irving Park Road. The attendant was not there, so she went to a payphone to call the police. Lilligren then went to her friend Rex's apartment, located above the rear parking lot of Leader Liquors. Before they walked up the stairs, Reynoso drove up, parked the car, and joined them. Stiles, Lilligren, and Reynoso all went to Rex's apartment. After a few minutes, she went to the bathroom, and Lilligren and Reynoso left. She heard gunshots coming from outside. When she went outside she saw Reynoso lying face down in the snow outside the open driver's side door of his car. She ran to Reynoso, turned him over, and saw that he had a blue cell phone in his hands. She took the phone. Lilligren was in the passenger side of the car; after she saw him, she started screaming and became hysterical. She tried to make a call on Reynoso's cell phone but could not get the call to go through.

¶ 31    Stiles ran through the alley toward her family's home at 4012 North Richmond Street. She screamed when she arrived at the house, and her mother and brother came out. She did not remember if there were any police cars around at that time. Officers eventually approached her when she was in the alley. She did not remember if those were the first officers she spoke to that night. She went back to the scene with the officers. She did not remember how long she stayed at the scene or which officer she gave Reynoso's cell phone to. She told officers that she, Reynoso, and Lilligren were in Rex's apartment above the back parking lot. She also spoke with a detective sometime later but did not remember when. Stiles spoke with defense counsel and his investigator, Josh Byrne, about a report that Byrne had created. She did not remember if she was given a copy of that report. The report was a written account of an interview of Stiles which she signed. In that report, she stated she saw Reynoso face down in the snow but did not see anyone running in the alley or any police cars in the area, including in the gas station parking lot. This interview took place in January 2008.

¶ 32    Stiles testified that she did not witness the shooting and did not remember many things that happened that night. Sergeant David Betz was taking notes as she talked to him, and she told him that she had been in a bar earlier that night. Stiles testified that she did not remember if she told Sergeant Betz that she was with Lilligren in the apartment above the parking lot before the shooting. She stated, "I don't remember everything. I mean this was

almost nine years ago." She added she was not looking at the gas station parking lot when she ran by it. She testified she remembered everything leading up to the shooting, but after seeing Lilligren shot in the head, "[y]ou're not going to remember who is around, who you're talking to."

¶ 33    In rebuttal, the State called Sergeant David Betz, who testified he spoke with Stiles at the scene of the shooting at approximately 12:40 a.m., and the conversation took place in a squad car because of the weather. He stated Stiles had a strong odor of alcohol and cigarettes. She told him she had been drinking at a bar down the street earlier that night. Stiles told him that when she saw Lilligren she started screaming for the police, and they arrived immediately. She never told Betz she had been in an apartment above Leader Liquors that night, and she did not give him the names of anyone who lived in that building.

¶ 34    Chicago police detective Dino Amato also testified in rebuttal. He interviewed Stiles at 4:00 a.m. on March 21, 2003. The interview took place at her home with two other detectives present. Stiles told him that she met up with Lilligren on Irving Park Road, after she had just left a bar, and they went to the gas station together. She also told Detective Amato that the police arrived immediately after she found Lilligren shot in the car. She added that she called the police when she could not find the gas station attendant; she then went to Riza Dauti's house. She stated she was there with Lilligren and Reynoso. She went to the bathroom, heard shots fired, and then went outside and found that Lilligren and Reynoso had been shot. She did not tell the detectives that she ran down the alley after finding the shooting victims or that she spoke with her family at her house. Detective Amato testified that the detectives attempted to find someone in the apartments above the Leader Liquors parking lot on the night of the shooting but could not gain access because the entrance door was locked. The State rested.

¶ 35    The jury found defendant guilty on both counts of first degree murder and sentenced him to life imprisonment. He now appeals.

¶ 36                                    ANALYSIS

¶ 37    Defendant argues he was not proven guilty of the murders of Reynoso and Lilligren beyond a reasonable doubt because Officer Sedlacek's and Officer Park's identifications were insufficient to support his convictions beyond a reasonable doubt. Defendant also questions Officer Sedlacek's credibility because he was unable to identify defendant by name at the scene and in his incident reports.

¶ 38    On appeal, when the defendant challenges the sufficiency of the evidence, the reviewing court must determine, after viewing the evidence in the light most favorable to the State, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A reviewing court affords great deference to the trier of facts and does not retry the defendant on appeal. *People v. Smith*, 318 Ill. App. 3d 64, 73 (2000). "[A] reviewing court must allow all reasonable inferences from the record in favor of the [State]." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A criminal conviction will not be reversed "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt." *People v. Graham*, 392 Ill. App. 3d 1001, 1009 (2009).

¶ 39    It is within the function of the trier of fact to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in

the evidence. *Id.* It is not the duty of the trier of fact to accept any possible explanation that favors the defendant's innocence and "elevate it to the status of reasonable doubt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). A reviewing court will not substitute its judgment for that of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 40    Here, defendant alleges that the identification testimony of both Officer Sedlacek and Officer Park was insufficient to support his conviction. Illinois applies the following factors to assess identification testimony: (1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989). "A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *Slim*, 127 Ill. 2d at 307.

¶ 41    With respect to the first and second factors, the witness's opportunity to observe the offender during the incident and the degree of attention, defendant argues that Officer Sedlacek and Officer Park would not have enough time, as they were chasing him through the alley, to see his face and be able to correctly identify him. Defendant adds both officers testified that they were looking at the gun in his hand as they were chasing him. However, both officers testified that as defendant was running, his hood fell back, allowing them to see an unobstructed view of his face from a distance of 10 to 12 feet away in a well-lit alley. They positively identified him only 15 to 20 minutes later. We find Officer Sedlacek and Officer Park had ample opportunities to view defendant, and they testified to a degree of detail that would allow the jury to make a determination as to the appropriate weight to be given their identification testimony.

¶ 42    Third, we consider the accuracy of the witness's description of defendant. The officers witnessed defendant, who was armed, kill two people and gave chase. While Officer Park's description of defendant was somewhat general, the description of the fleeing offender given over the radio was accurate to the extent that it matched the defendant running through the neighborhood gangways within four minutes of the shooting in close proximity to the scene. Fourth, we consider the level of certainty the witness demonstrates in identifying defendant as the offender. Both officers identified defendant without hesitation shortly after seeing his face in the alley. Finally, we consider the amount of time between the commission of the crime and the identification. As stated, the officers identified defendant about 15 to 20 minutes after the shooting. After considering all five *Biggers* factors, we find the officers' identification testimony to be reliable. Officer Sedlacek's inability to recall defendant's name at the scene in no way impugns his credibility or his subsequent identification of defendant.

¶ 43    Defendant further argues that outside of the identification testimony provided by Officer Sedlacek and Officer Park, very little evidence linked him to the murder of Reynoso and Lilligren. We disagree.

¶ 44    Officer Sedlacek and Officer Park witnessed the shooting and then chased defendant through the alley. During this chase, the officers were able to see a full-frontal view of defendant's face in well-lit conditions. Officer Sedlacek recognized defendant but did not remember his name. In less than five minutes, defendant was apprehended four blocks from the scene of the shooting. The gun used in the shooting was recovered from the roof of a

garage located in the path the shooter took when chased by the police between the scene of the shooting and where defendant was first seen by Officer Castillo. Officer Castillo observed defendant throw a pair of black gloves on the ground, which later tested positive for gunshot residue. Lorena Reynoso testified that her brother and defendant had been friends, but in the months leading up to the murder, Reynoso did not want to speak to defendant when he came to his home looking for him.

¶ 45    Defendant was seen running from the area of the shooting and matched the general description of the offender. Defendant's flight from Officer Castillo and the officers who witnessed the shooting is considered evidence of his guilt. Defendant was identified as the shooter less than 15 minutes afterwards. He was wearing clothing that matched the clothing worn by the shooter. The murder weapon was found on the route the shooter took when running from the scene to where he was first observed by Officer Castillo minutes after the shooting. Viewing the evidence in the light most favorable to the State, as we must, we find that the totality of the evidence was more than sufficient to establish defendant's guilt beyond a reasonable doubt.

¶ 46    Defendant has also attacked the sufficiency of the physical evidence, the lack of conclusive trace material, the checkbook found alongside the gloves, and the lack of DNA evidence. The jury resolved the evidence in favor of the State, and we cannot say it was the act of an irrational jury.

¶ 47    Defendant next argues that the trial court erred when it denied his motion *in limine* to preclude the State from introducing hearsay evidence that Reynoso was avoiding defendant. The trial court denied this motion and ruled that the State could introduce evidence that, after defendant knocked on Lorena's door, Lorena went and spoke with her brother, came back to the door, and told defendant that her brother was not home.

¶ 48    At trial, Lorena testified that approximately a week and a half before Reynoso's death, she was at home with him when defendant came to her door with two other men she knew as "Blood" and "Terry." Defendant asked where Reynoso was. Lorena went back and spoke with Reynoso and then returned to the door and told defendant that Reynoso was not there.

¶ 49    Reviewing courts generally use an abuse of discretion standard to review evidentiary rulings rather than review them *de novo*. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Defendant argues that this court should review this issue using the *de novo* standard and states "an appellate court should review *de novo* where the trial judge's decision 'involves a legal issue and did not require the trial court to use its discretion regarding fact-finding or assessing the credibility of witnesses.' " *People v. Aguilar*, 265 Ill. App. 3d 105, 109 (1994). This exception to the general rule of deference applies in cases where "a trial court's exercise of discretion has been frustrated by an erroneous rule of law." *People v. Williams*, 188 Ill. 2d 365, 369 (1999).

¶ 50    In *People v. Caffey*, 205 Ill. 2d 52, 89 (2001), the defendant also requested the reviewing court to apply a *de novo* standard to evidentiary rulings regarding hearsay. Our supreme court rejected this argument and stated,

> "The decision whether to admit evidence cannot be made in isolation. The trial court must consider a number of circumstances that bear on that issue, including questions of reliability and prejudice. [Citation.] In this case, the trial court exercised discretion in making these evidentiary rulings, *i.e.*, the court based these rulings on the specific circumstances of this case and not on a broadly applicable rule." *Id.* at 89-90.

Here, the trial court based its ruling on the circumstances of the case, and therefore, following *Caffey*, we reject defendant's argument that the trial court's decision to admit the testimony of Lorena should be reviewed *de novo*, and instead, we will apply the abuse of discretion standard.

¶ 51    "Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion." *People v. Reid*, 179 Ill. 2d 297, 313 (1997); *Caffey*, 205 Ill. 2d at 89. An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Caffey*, 205 Ill. 2d at 89; *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 52    Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). A statement is an oral or written assertion, or non-verbal conduct of a person if it is intended by the person as an assertion. Ill. R. Evid. 801(a) (eff. Jan. 1, 2011). Assertive conduct, as well as actual statements, may constitute hearsay. *People v. Orr*, 149 Ill. App. 3d 348, 362 (1986). A statement that is offered for some other reason, not to prove the truth of the matter asserted, is generally admissible because it is not hearsay. *People v. Hill*, 2014 IL App (2d) 120506, ¶ 51.

¶ 53    Defendant argues that the only purpose of Lorena's testimony was to assert that Reynoso had made a statement to Lorena that he was fearful of the defendant. However, Lorena did not testify to any statement by Reynoso or that Reynoso made any assertion of fear. She simply testified that approximately a week and a half before Reynoso's death, she was at home with her brother. Defendant came to her door with two other men she knew as "Blood" and "Terry." Defendant asked where Reynoso was. Lorena was asked the following questions and gave the following answers:

> "Q. After they asked if [Reynoso] was home, did you have a conversation with [Reynoso]?
>
> A. Right.
>
> Q. After that conversation with [Reynoso], did you then talk to [defendant]?
>
> A. Right.
>
> Q. What did you say to [defendant]?
>
> A. That [Reynoso] wasn't there.
>
> Q. Did those three individuals then leave at that point?
>
> A. Right."

¶ 54    The testimony complained of here is not hearsay, as there is no mention of assertive conduct by Reynoso, nor does it contain any verbal conversation that took place between Reynoso and Lorena. She did not testify to anything that could be considered assertive conduct, let alone conduct that could be considered as an assertion offered to prove the truth of some relevant fact.

¶ 55    The defendant further argues that Lorena's testimony was prejudicial because the State offered no further evidence to suggest motive other than this incident. The State is not required to prove motive in order to convict the defendant of first degree murder. *People v. Shack*, 396 Ill. 285, 292 (1947). Furthermore, prejudice to the defendant is one of the factors weighed by the trial court and is taken into consideration with the relevance of the testimony.

¶ 56    The trial court limited the testimony to what Lorena said and did, and the content of her discussion with Reynoso was not permitted. Therefore, we find that the trial court did not abuse its discretion in allowing the testimony of Lorena.

¶ 57    Defendant next argues that the trial court erroneously precluded defense counsel from cross-examining Officer Park regarding whether or not he would describe defendant as "black." The following exchange took place during the trial:

> "[Defense counsel]: If you—the defendant over there, the guy you identified. If you were—if you were going to identify that person for those people right now, would you—
> STATE: Objection, Judge.
> THE COURT: Sustained.
> [Defense counsel]: —would you say that person was black?
> STATE: Objection.
> THE COURT: Sustained.
> [Defense counsel]: That's how you would describe that person, is black?
> STATE: Objection.
> THE COURT: Sustained."

¶ 58    Defendant argues that by sustaining the prosecutor's objections to this line of questioning, the trial court erred because it precluded him from cross-examining Officer Park about the description he gave of the offender whom he later identified to be defendant. Defendant argues, without elaboration, that his sixth amendment right to cross-examination was violated when the court precluded defense counsel from cross-examining Officer Park as to whether he would describe defendant as "black." Defendant argues that Officer Park's response to this inquiry would go to his credibility and the reliability of his identification. We disagree.

¶ 59    Again, defendant claims that this issue should be reviewed *de novo*. For the reasons already stated, we review this issue for abuse of discretion.

¶ 60    Defendant correctly asserts that the sixth amendment to the Constitution guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. U.S. Const., amend. VI. Confrontation means "more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). This right applies to federal and state proceedings. *Pointer v. Texas*, 380 U.S. 400 (1965).

¶ 61    We recognize defendant's sixth amendment right, but note that while a trial court may not deprive a defendant of the right to question witnesses, it may limit the scope of cross-examination. *People v. Frieberg*, 147 Ill. 2d 326, 357 (1992). The latitude permitted on cross-examination is left largely to the discretion of the trial court, and its determination will not be overturned absent a clear abuse of discretion that resulted in manifest prejudice. *People v. Herrera*, 238 Ill. App. 3d 284, 290 (1992). Here, defendant was not precluded from cross-examining Officer Park. Defense counsel cross-examined Officer Park at length. Defendant was merely precluded from pursuing this line of questioning.

¶ 62    While the State did not offer the basis of its objection to this line of questioning, and the trial court did not give its reason for sustaining those objections, we can determine from the

record before us that the evidence defendant was attempting to elicit during Officer Park's cross-examination was not relevant.

¶ 63     Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). Irrelevant evidence is inadmissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). The question seemingly asked to impeach Officer Park's credibility was, "If you—the defendant over there, the guy you identified. If you were—if you were going to identify that person for those people right now, would you—" "—would you say that person was black," was asking Officer Park to identify the race of the defendant at the time of the trial. The admissibility of evidence that is collateral to an issue in a case and that is intended to affect the credibility of a witness rests within the sound discretion of the trial court, and the decision to exclude certain collateral evidence will not be disturbed absent an abuse of discretion. See *People v. Renslow*, 98 Ill. App. 3d 288, 293-94 (1981); *People v. Stack*, 311 Ill. App. 3d 162, 178-79 (1999).

¶ 64     Officer Park testified that he "saw him shooting into a car, and he was running with a gun, and I did my best, gave a description" that described the shooter as "a male" "dressed in all black, and he was a male black." Each individual juror was able to observe defendant's appearance in open court and presumably made independent determinations as to whether the defendant fit the description given at the time of the shooting ("male black"). It is within the function of the trier of fact to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence. *People v. Graham*, 392 Ill. App. 3d 1001, 1009 (2009).

¶ 65     As defendant acknowledges in his brief, the attempted impeachment of Officer Park was complete simply when he admitted his prior description of defendant as "black" and looking at the defendant. Defendant admits on appeal that he is of "African-American ancestry" but appears to be "Caucasian or Hispanic." Defendant argues, "[e]ither answer Park could have given would have damaged his credibility: Had he answered that he would describe Anderson as black he would have appeared to be a liar, and had he answered he would describe Anderson as white or Hispanic he would have contradicted one of the few details of his prior description." Although the court did not permit defense counsel to ellicit testimony from Officer Park regarding his opinion of defndant's race, defendant was not restricted from cross-examining Officer Park about the description he relayed over the radio as the events were unfolding. Defendant made his point by highlighting Officer Park's radio description as the offender being "black" and allowing the jury to draw their own conclusion as to whether this tended to support a conclusion that defendant was the offender Officer Park saw that evening. The issue of whether defendant fit the description Officer Park gave during the incident was addressed by the defendant in opening statement and thoroughly exhausted during the trial. There is no question the jury understood the point. Therefore, we find that the trial court did not abuse its discretion in precluding Officer Park from testifying about whether he would, at trial, describe defendant as "black."

¶ 66     Defendant also argues that the trial court erred when it precluded defendant from cross-examining Officer Sedlacek about whether defendant was acquitted in a prior case. Defendant argues that his sixth amendement right was also violated by this ruling.

¶ 67     On direct examination, Officer Sedlacek was asked whether he "recognized the defendnat from before." Officer Sedlacek responded, "[y]es, sir." When asked what defendant's

nickname was, Officer Sedlacek replied, "Nookie." On cross-examination, defense counsel questioned Officer Sedlacek about how and why he was familar with defendant "from before." Officer Sedlacek testified that he previously arrested defendant along with Hill and Reynoso in July 2001 for the aggravated battery of a man named Edward Binabi. That trial was held on April 8, 2002, and Officer Sedlacek testified at that trial.

¶ 68    The State objected and during a dicussion with the court, the defense stated it was attempting to cross-examine Officer Sedlacek as to the fact that defendant was acquitted of the aggravated battery charge, and the defense wanted to elicit this testimony to establish that Officer Sedlacek had a motive to falsely identify defendant in this case. The trial court ruled that the acquittal was not relevant.

¶ 69    Defendant again argues that this issue should be reviewed *de novo*. However, as we have stated, the review of an evidentiary ruling will be reviewed under the abuse of discretion standard.

¶ 70    As previously stated, the sixth amendment right to cross-examination is not without limit. "A judge may limit the scope of cross-examination, and unless the defendant can show his or her inquiry is not based on a remote or uncertain theory, a court's ruling limiting the scope of examination will be affirmed." *People v. Tabb*, 374 Ill. App. 3d 680, 689 (2007). "The admissibility of evidence rests within the discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion." *People v. Pikes*, 2013 IL 115171, ¶ 12.

¶ 71    The fact that defendant was acquitted of the aggravated battery charge does not alone suggest that Officer Sedlacek had a motive or bias to falsely identify defendant as the shooter in this case. Officer Sedlacek testified about other facts of defendant's aggravated battery case during direct examination, including that he had previously arrested defendant in 2001, that Reynoso and Hill were also charged in the same case, and that he testified at the aggravated battery trial on April 18, 2002. Officer Sedlacek added that he had responded to the scene of an alleged battery on June 27, 2001 and spoke to the victim and that Chicago Police Detective Murphy was a witness to the altercation. Officer Sedlacek arrested defendant on July 1, 2001, and had him transported to the police station. While there, Officer Sedlacek sat face-to-face with defendant in a well-lit room for approximately two hours. Officer Sedlacek testified further on cross-examination that he first recognized defendant in this case when he was 10 to 12 feet away from defendant chasing him in the alley.

¶ 72    In *People v. Buckner*, 376 Ill. App. 3d 251, 255 (2007), this court examined whether the trial court properly limited cross-examination for bias where the State's DNA expert was serving an 18-month supervision for unearned overtime pay, including overtime pay for working on the defendant's case. This court ruled the evidence failed to show that the witness had either the motive or the ability to falsify her testimony and noted that the proffered "evidence must give rise to the inference that the witness has something to lose or gain by testifying." *Id.*

¶ 73    In this case, the argument proffered by the defendant that because defendant was acquitted in the aggravated battery case involving Officer Sedlacek, Officer Sedlacek had a motive to "either consciously or subconsciously" falsely identify defendant is pure conjecture and did not tend to establish that Officer Sedlacek harbored any bias toward defendant. Notably, defendant did not deny the arrest or the circumstances surrounding the aggravated battery, instead choosing to focus on Officer Sedlacek's previous arrest of defendant, the

time he spent with him, and how this familiarity should have caused him to identify defendant by name at the scene.

¶ 74 Officer Sedlacek's testimony regarding defendant's prior arrest was not elicited by the State as other crimes evidence. Rather, it was raised by defendant for the first time on cross-examination. The State, on direct examination, merely asked Officer Sedlacek whether he recognized defendant. It was defense counsel that delved further into the circumstances surrounding that prior meeting. Officer Sedlacek's only role in the prior case was that he arrested defendant based on the victim's complaint. This testimony is simply part of his ordinary duties as a police officer and without more does not establish grounds to infer bias as a result of an acquittal. Therefore we cannot say that the trial court abused its discretion in denying defendant's request.

¶ 75 Even if the trial court should have admitted testimony regarding defendant's acquittal in the aggravated battery case, the court's failure to allow this testimony is harmless error. To determine whether an error is harmless beyond a reasonable doubt we must consider (1) whether the error contributed to the defendant's conviction, (2) whether the other evidence in this case overwhelmingly supported the defendant's conviction, and (3) whether the excluded evidence would have been duplicative or cumulative. *People v. Blue*, 205 Ill. 2d 1, 26 (2001).

¶ 76 The evidence of defendant's acquittal would not have been cumulative or duplicative. In addition, as discussed, the other evidence in this case, both physical and circumstantial, overwhelmingly supports defendant's conviction. We also fail to see how the exclusion of testimony regarding defendant's acquittal in an unrelated aggravated battery case would contribute to his conviction.

¶ 77 Defendant next argues that the trial court erred when it denied his motion *in limine* to introduce the testimony of an expert witness on eyewitness identification. Prior to trial, defendant moved *in limine* to allow testimony by Dr. Solomon Fulero, an expert on eyewitness testimony. After arguments, the trial court denied the motion.

¶ 78 A criminal defendant's right to due process and a fundamentally fair trial includes the right to present witnesses on his or her own behalf. *People v. Lerma*, 2014 IL App (1st) 121880, ¶ 35 (*Lerma I*); *People v. Wheeler*, 151 Ill. 2d 298, 305 (1992). "In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288 (1990). Expert testimony addressing matters of common knowledge is not admissible "unless the subject is difficult to understand and explain." *People v. Becker*, 239 Ill. 2d 215, 235 (2010). In addressing the admission of expert testimony, the trial judge should balance the probative value of the evidence against its prejudicial effect to determine the reliability of the testimony. *Enis*, 139 Ill. 2d at 290. Furthermore, the necessity and relevance of the expert testimony should be carefully considered in light of the facts of the case. *Id.*; *People v. Tisdel*, 338 Ill. App. 3d 465, 468 (2003) ("Trial courts should carefully scrutinize the proffered testimony to determine its relevance—that is, whether there is a logical connection between the testimony and the facts of the case."). Relevant and probative testimony should be admitted, whereas misleading or confusing testimony should not be admitted. *Tisdel*, 338 Ill. App. 3d at 468. When determining the reliability of an expert witness, the trial judge is given broad discretion. *Enis*, 139 Ill. 2d at 290. Therefore, we review the trial court's decision to admit evidence, including expert witness testimony, for an abuse of that discretion. *Becker*,

239 Ill. 2d at 234. Arbitrary, fanciful, or unreasonable decisions by the trial court constitute an abuse of discretion. *Id.*

¶ 79 In *People v. Lerma*, 2016 IL 118496 (*Lerma II*), our supreme court was presented with a similar issue. The defendant was convicted of first degree murder after the evidence established that defendant, known as "Lucky," approached the front steps of a home where he shot two people. The female victim dragged the critically wounded male victim into the house. The male victim, in the presence of his father (who came onto the scene after hearing gunshots and his son's screaming) and the female victim, stated that "Lucky" shot me. There was testimony that "Lucky" lived across the street from the house where the victims were shot, one victim had been friends with "Lucky" for years, and "Lucky" had been fighting with a member of one of the victim's family. The two victims were African-American while the defendant was Hispanic. *Id.* ¶ 5. The identification of defendant as the shooter was established through the testimony of the surviving victim and the father of the deceased victim about the dying declaration of the decedent.

¶ 80 The trial court initially denied defendant's motion *in limine* seeking to present the testimony of Dr. Fulero, an expert witness on eyewitness identification. Defendant submitted a detailed motion containing Fulero's proposed testimony, consisting of a summary of the relevance of that testimony to the issues in that case and a detailed report authored by Dr. Fulero. *Id.* ¶ 8. After examination, the trial court denied this motion, finding that the eyewitnesses who identified "Lucky" knew him prior to the shooting and therefore were less likely to "misidentify someone they have met or know or [have] seen before than a stranger." The trial court also found that because the eyewitnesses knew the defendant, Dr. Fulero's testimony was irrelevant and "ran the risk" of "operating as his opinion on the credibility" of the eyewitnesses. (Internal quotation marks omitted.) *Id.* ¶ 10. During the trial, defendant renewed his request for expert testimony and stated he had secured a different expert who would be able to testify regarding eyewitness testimony. *Id.* ¶ 14. The trial court again rejected this motion, citing the same reasons given in the denial of the first motion. *Id.* ¶ 16.

¶ 81 During trial, after the State had presented the eyewitness testimony, defense counsel renewed his motion to call an identification expert. *Id.* ¶ 14. Because Dr. Fulero had since passed away, defense counsel tendered a report authored by Dr. Geoffrey Loftus, an expert in the field of human perception and memory, in support of his renewed motion. Dr. Loftus's report tracked the content of Dr. Fulero's report, except in two instances. First, Dr. Loftus stated that he would not "issue judgments" about whether witnesses' memories or assertions were correct and that any part which implied the unreliability of the eyewitness should not be construed as meaning that the defendant was innocent. Second, Dr. Loftus's report discussed the issues involved with acquaintance identifications. *Id.* ¶ 14. The trial court denied the renewed motion stating that his denial was "consistent with the reasons *** set forth in detail when [the court] made the ruling on your similar motion with respect to Dr. Fulero." (Internal quotation marks omitted.) *Id.* ¶ 16. Defendant was convicted and appealed.

¶ 82 On appeal, this court reversed the trial court's ruling denying the admission of expert testimony of the matter of eyewitness identification and remanded the case. *Lerma I*, 2014 IL App (1st) 121880. This court found because the trial court "failed to conduct a meaningful inquiry" into the proposed testimony of Dr. Loftus, instead relying on its reasons for denying the admission of Dr. Fulero's testimony, it committed reversible error. (Internal quotation marks omitted.) *Id.* ¶ 37. This court stated, "We also find it difficult to accord the customary

degree of deference to the trial court's discretion in this case because the trial court, in relying on its prior ruling, explained itself with little more than a series of conclusions based on its personal belief." *Id.* ¶ 38. The State appealed.

¶ 83　　Our supreme court found the issue to be addressed as "whether the trial court abused its discretion in denying defendant's request to allow Dr. Loftus's expert testimony on the reliability of eyewitness identifications." *Lerma II*, 2016 IL 118496, ¶ 24. Before addressing the merits of the State's argument, the *Lerma II* court recognized that the research concerning eyewitness identification is well-settled and well-supported and "in appropriate cases a perfectly proper subject for expert testimony." *Id.*

¶ 84　　The *Lerma II* court began its analysis by stating that "this is the type of case for which eyewitness testimony is both relevant and appropriate" given that the only evidence of the defendant's guilt was the eyewitness identifications made by two witnesses. *Id.* ¶ 26. There was no physical evidence and no confession or other incriminating statements. The court held that the trial court abused its discretion in denying defendant's request to admit Dr. Loftus's expert testimony, finding the trial court's reasoning to be troublesome and stating, "even if [the trial court's reasoning] is defensible as to Dr. Fulero's expected testimony, it is not defensible as to Dr. Loftus's expected testimony," where Dr. Loftus's report addressed two important issues not addressed by Dr. Fulero: the acquaintance identification and his statement that he would not include any opinion on the credibility of any witness or identification. *Id.* ¶ 28.

> "As discussed above, what we have in this case is the trial court denying defendant's request to present relevant and probative testimony from a qualified expert that speaks directly to the State's only evidence against him, and doing so for reasons that are both expressly contradicted by the expert's report and inconsistent with the actual facts of the case. A decision of that nature rises to the level of both arbitrary and unreasonable to an unacceptable degree, and we therefore find that the trial court's decision denying defendant's request to admit Dr. Loftus's expert testimony was an abuse of discretion." *Id.* ¶ 32.

¶ 85　　The court further found that the error was not harmless because "there [was] no question that the error contributed to the defendant's conviction," it could not "be said that the other evidence in the case overwhelmingly supported the defendant's conviction," and "the excluded testimony from [the expert] was neither duplicative nor cumulative of other evidence, as the jury in this case heard precisely nothing in the nature of expert eyewitness testimony." *Id.* ¶ 33.

¶ 86　　We find *Lerma II* distinguishable from the instant case. Here, defendant's conviction does not rest solely on the identification made by Officer Sedlacek and Officer Park. Not only did the officers see defendant shoot the victims, they chased him through an alley. After they lost sight of him, another officer saw the defendant, who was wearing clothes that matched a radio broadcast that described the shooter, running through a gangway and alley near the shooting, and defendant was detained four blocks from the shooting only four minutes after it had occurred. In addition, defendant was seen throwing down a pair of black gloves that later tested positive for gunshot residue. Additionally, the murder weapon was found on the route between where Officer Sedlacek and Officer Park chased defendant and where Officer Castillo later observed him running. Defendant was then identified separately by both Officer Sedlacek and Officer Park only 20 minutes after the shooting. The trial court weighed the

facts and circumstances of this case and correctly concluded that the conclusion to be reached would not "rise or fall on the identification of two police officers alone." Unlike *Lerma*, there was physical and circumstantial evidence outside of the identification testimony that supported defendant's conviction.

¶ 87    Furthermore, unlike *Lerma*, there was no report submitted by Dr. Fulero in this case, nor did the defense submit a detailed motion containing the proposed testimony of Dr. Fulero or a summary of the relevance of that testimony to the issues in this case. Instead, the defense submitted a generalized motion indicating that Dr. Fulero would testify to common misconceptions regarding eyewitness identifications, the accuracy of eyewitness identifications and the effect of suggestivity or bias, how memory effects eyewitness identification, "factors associated with verified cases of misidentification and as observed in this particular case," and that "the eyewitnesses in the present case are not reliable based on the factors in this case."

¶ 88    Here, the trial court did not abuse its discretion in prohibiting the defense from presenting an expert witness on identification testimony, especially where Dr. Fulero would be commenting on the "reliability" of these witnesses, which is clearly a function of the jury, not a purported expert. The trial court conducted a meaningful inquiry of the expert witness and the content to which he would testify at a hearing on defendant's motion and, in its discretion, denied the motion. The record shows that the trial court balanced the probative value against the possible prejudice that may arise from allowing this expert to testify. In addition, the jury was given an instruction on how to weigh eyewitness identification testimony. Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000). Therefore, we find that the trial court's decision was not arbitrary or unreasonable and does not amount to an abuse of discretion.

¶ 89    Even if this was the type of case for which expert eyewitness testimony was relevant and appropriate, which it is not, the trial court's denial of defendant's request is a harmless error. To determine whether an error is harmless beyond a reasonable doubt we must consider (1) whether the error contributed to the defendant's conviction, (2) whether the other evidence in this case overwhelmingly supported the defendant's conviction, and (3) whether the excluded evidence would have been duplicative or cumulative. *Blue*, 205 Ill. 2d at 26.

¶ 90    While Dr. Fulero's testimony would not have been cumulative or duplicative, the exclusion of his testimony cannot be said to have contributed to defendant's conviction. As discussed, the other evidence in this case, both physical and circumstantial, overwhelmingly supports defendant's conviction.

¶ 91    Defendant also argues that the trial court erred when it denied his motion for a new trial where he presented newly discovered evidence that the murders were committed by Jesus Quinones and Angel Rosa.

¶ 92    At the hearing on his motion for a new trial defendant argued there was newly discovered evidence that Jesus "Blood" Quinones and Angel "JR" Rosa committed the murders. This evidence consisted of inculpatory hearsay statements made by Quinones and Rosa admitting to committing the murders of Reynoso and Lilligren, and exculpating defendant. After an extensive evidentiary hearing, the trial court denied defendant's motion for a new trial based on newly discovered evidence. The trial court ruled the newly presented evidence was not of such a conclusive character as to warrant a new trial because the evidence against defendant at trial was not closely balanced. The trial court further ruled that the evidence allegedly

establishing that the murders were committed by Quinones and Rosa was not "newly discovered" because it was "known by maybe even the defendant according to one of the witnesses prior to trial," and because it could have been discovered prior to trial in the exercise of due diligence. The trial court finally noted that this evidence was immaterial.

¶ 93 Reynoso and Lilligren were murdered on March 5, 2003. Defendant's trial began on November 2, 2011. Quinones, also known as "Blood," died in March 2004, and Rosa, also known as "JR," died in August 2007.

¶ 94 To warrant a new trial based on newly discovered evidence, the evidence (1) must have been discovered since the trial, (2) must be of such a character that it could not have been discovered prior to trial with the exercise of due diligence, (3) must be material to the issue and not merely cumulative, and (4) must be of such a conclusive character that it will likely change the result on retrial. *People v. Gabriel*, 398 Ill. App. 3d 332, 350 (2010). The trial court's denial of a motion for a new trial based on newly discovered evidence will be reversed on appeal if the trial court abused its discretion. *People v. Villareal*, 201 Ill. App. 3d 223, 229 (1990).

¶ 95 Defendant presented the testimony of five witnesses, four of whom were his friends and one of whom was his sister. All of the witnesses, except his sister, claimed to have heard one or both of the alleged shooters, Quinones or Rosa, admit to committing the murders of Reynoso and Lilligren. Quinones and Rosa, who are now deceased, were also friends with the defendant.

¶ 96 Anela Pehlivanovic testified that in the summer of 2003, she asked "Blood" what was going on with defendant's murder case, and "Blood" said, "[w]e took care of that anything [*sic*] nigga." Anela did not know who the "we" "Blood" spoke of referred to and admitted "we" could have meant "Blood" and defendant. Anela also testified the reason she never told defendant what "Blood" said, even though she visited defendant in prison, was because the "we" defendant referred to may have meant the defendant. This statement did not exclude defendant's participation in the murders and was not conclusive enough to change the result at retrial. Furthermore, the evidence was known before trial and through due diligence could have been discovered prior to defendant's trial. The trial court properly denied defendant's motion regarding Anela's testimony.

¶ 97 James Jones testified that both "Blood" and "JR" confessed to him several months after these murders took place. James was contacted by defendant's sister, Susan, after defendant was convicted. She contacted James because defendant (after he began to proceed *pro se* posttrial) gave her a list of names of people who may have information. Since defendant knew to ask James for information regarding the murders, this information could have been discovered before the trial. The trial court properly denied defendant's motion regarding James's testimony.

¶ 98 Mercedes Rodriguez testified that three days after the murders, "Blood" and "JR" confessed to committing the murders. Rodriguez visited defendant nine times prior to his trial, but after both "Blood" and "JR" had died, and never told defendant or anyone else about the confessions. Despite this, she did not come forward until nine and a half years after the murders took place. Her testimony may also have been discovered through due diligence prior to trial, and the trial court properly denied defendant's motion regarding Rodriguez's testimony.

¶ 99      The testimony of Irving Gonzalez establishes that all the substance of the purported testimony from Anela, James, and Rodriguez was known before trial. Gonzalez testified that "JR" confessed to him in August 2007. "JR's" confession involved two shooters, a claim which is discredited by the eyewitness testimony and the physical evidence in this case. The ballistics evidence conclusively determined that only one gun was used to commit these murders. Gonzalez's testimony was impeached by the physical evidence and would not have conclusively changed the outcome of the retrial. Gonzalez further testified that he told one of defendant's attorneys, defendant, and defendant's wife of the alleged confession. Defendant's sister also heard Gonzalez tell defendant's attorney about the alleged confession, and she then informed the defendant. Therefore, this was not newly discovered evidence but was evidence known before the trial occurred. The trial court properly denied defendant's motion regarding Gonzalez's testimony.

¶ 100      Defendant's sister, Susan, states that she never heard anyone confess, but she did hear Gonzalez tell defendant's attorney that "Blood" and "JR" confessed, and she was "pretty sure" she told defendant about this the next time she visited him in jail. She visited defendant about 20 times in 2009 and in 2011, right before defendant's trial.

¶ 101      Each of the four witnesses claim that the murders of Reynoso and Lilligren were confessed to and committed by two people, yet the eyewitness testimony and physical evidence definitively disproves this assertion. Therefore, in each instance the trial court was correct in concluding that the evidence would not have conclusively changed the result of the retrial because none of the alleged confessions by "Blood" or "JR" tended to negate defendant's participation in the murder.

¶ 102      The trial court properly denied defendant's motion for a new trial based on newly discovered evidence. Here, the evidence could have been discovered prior to trial through due diligence and was not of such a conclusive character that it would likely change the result on retrial. The evidence presented by the five witnesses that came forward would not have likely changed the outcome of the trial in light of the entirety of the evidence presented.

¶ 103      Defendant also argues that all of the above testimony would be admissible based on either *Chambers v. Mississippi*, 410 U.S. 284 (1973), or Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011). Under *Chambers*, there are four factors used to evaluate admissibility. The four aspects of a hearsay statement which tend to make the statement admissible are: (1) it was made spontaneously to a close acquaintance shortly after the crime occurred, (2) it was corroborated by other evidence, (3) it was self-incriminating and against declarant's interest, and (4) there was adequate opportunity for cross-examination of the declarant. *Chambers*, 410 U.S. at 300-01. The *Chambers* factors are merely guidelines to admissibility; the presence of all four factors is not required. *People v. Tenney*, 205 Ill. 2d 411, 435 (2002).

¶ 104      Defendant argues that Rodriguez's testimony satisfies three of the four *Chambers* factors and should be admissible. We disagree. Her testimony was not corroborated by other evidence, and there is not an adequate opportunity to cross-examine either Quinones or Rosa, thus making her hearsay testimony unreliable even if Quinones allegedly told her days after the murder that he and Rosa had committed the murders.

¶ 105      Under Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011), a statement of an unavailable declarant is admissible if it is a:

"statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or

- 20 -

criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

While both alleged declarants are unavailable, there are no "corroborating circumstances [to] clearly indicate the trustworthiness of the statements." *Id.*

¶ 106    We find that the trial court did not abuse its discretion in denying defendant's motion for a new trial based on the testimony provided during the hearing. The testimony of all the witnesses could have been discovered before trial and was not so conclusive as to change the outcome of the trial.

¶ 107    Next, defendant argues that the prosecutor deprived defendant of a fair trial when he made prejudicial comments during closing argument. Specifically, defendant claims that the prosecutor accused defense counsel of being "very good" at "trying to confuse the witnesses about case reports and supplemental reports and all this stuff," that defense counsel tried to "distort as much as possible," that defense counsel was "exaggerating to make it look like reasonable doubt and they couldn't have seen what they saw" and that the defense "was just going to throw it out there anyway." Regarding Stiles, the State argued that the defense was "trying to have her sign something so they could argue to you that she didn't see the police at all." Lastly, the State accused defense counsel of wanting the police to kill innocent people, saying that defense counsel, "thinks that the police should be shooting at everybody out there." An objection to this last comment was sustained.

¶ 108    Courts allow prosecutors great latitude in making closing arguments. *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987). A prosecutor may comment on the evidence and all reasonable inferences from the evidence. *People v. Pasch*, 152 Ill. 2d 133, 184 (1992). A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Argument that serves no purpose but to inflame the jury constitutes error. *Blue*, 189 Ill. 2d at 127-28. Statements will not be held improper if they were provoked or invited by the defense counsel's argument. *People v. Kirchner*, 194 Ill. 2d 502, 553 (2000).

¶ 109    There is a conflict regarding the correct standard for reviewing a prosecutor's remarks during argument. *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 32. In *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and *People v. Sims*, 192 Ill. 2d 592, 615 (2000), our supreme court suggested that we should review this issue *de novo*. In *People v. Hudson*, 157 Ill. 2d 401, 441 (1993), however, the court suggested that we should review this issue for an abuse of discretion. We need not take a position in this case, as defendant's claim fails under either standard.

¶ 110    The above complained of comments from the prosecutor were made during rebuttal argument, were invited by defense counsel's closing argument, and were a reasonable response to defense counsel's arguments. The defense asserted that the police were lying for their own convenience so that they did not have to perform a proper police investigation. The prosecutor's comment about defense counsel thinking "that the police should be shooting at everybody out there" was ultimately sustained. These remarks were also provoked by defendant's closing argument. Defense counsel questioned Officer Sedlacek's and Officer Park's credibility by stating:

"Two guys who, for the life of me to this day, if, in fact, they saw what they claim they saw, how do you not shoot this guy? How do you not fire one shot at a guy that you just saw kill two people? And Sedlacek said, you know, I'm not a killer. Well, you know, you're a policeman who you've just witnessed, according to you, a double murder, and you're within 10 feet of this guy as he's carrying a gun and he turns in your direction and you don't fire off a shot. Think about that, ladies and gentleman. Does that make sense? Neither one of these guys. Neither one."

¶ 111    Viewing the prosecutor's closing argument *in toto*, we find that the prosecutor's comments were not prejudicial and did not deprive defendant of a fair trial.

¶ 112    We also reject defendant's argument that the State attempted to define reasonable doubt and shift the burden of proof to the defendant. The State commented that the burden of proof was not "some kind of Everest that we have to scale." Defense counsel's objection to this remark was sustained. The State also argued that there was "no other explanation" of the gunshot residue evidence, and an objection to this statement was overruled. The State further added that defendant was the "unluckiest man in the world."

¶ 113    In *People v. Thompson*, 2013 IL App (1st) 113105, ¶¶ 86-94, this court held the State's comment that the reasonable doubt standard was not a "mystical magical burden" was not error. The first remark made by the State regarding the burden of proof was sustained by the trial court. The argument that there was "no other explanation" for the gunshot residue evidence does not shift the burden to the defendant. The prosecutor was merely highlighting unimpeached evidence that had been admitted. Furthermore, claiming the defendant was the "unluckiest man in the world" was invited by the defense closing argument claiming defendant was at the wrong place at the wrong time and falsely identified. These comments do not amount to unfair prejudice to the defendant.

¶ 114    Defendant next asserts the State committed prejudicial error by arguing, "[c]ounsel talks about, well, why we didn't do a lineup. It's not fair to Robert Anderson. Well, there is a reason why, and you heard that reason during the trial. Because what if it's the wrong guy? Because what if it's the wrong guy? What do we say to the victim's family then? Well, sorry, we did a whole lineup." The defense then objected and was overruled. The State continued, "We did a whole lineup and it took us about three hours or a couple hours to get the lineup together, but you know what, it wasn't him and, sorry, we didn't catch him that night." This argument was in direct response to defendant's argument that show-up identifications were flawed and unreliable. The prosecution was merely emphasizing that show-up identifications are done in emergency situations when a suspect is caught quickly after an offense to confirm his identity by a witness, because if the witness states that the suspect was not the offender, the police can quickly begin searching for the correct offender. The prosecution was demonstrating the consequences of using a traditional lineup under the circumstances of this investigation. These comments were not inflammatory or prejudicial.

¶ 115    Finally, defendant asserts he was prejudiced by the State arguing that a guilty verdict was the only way to make defendant "accept responsibility for what he did that night," and they should "tell him that his murdering days are over." The trial court sustained the objections to these remarks.

¶ 116    These rebuttal comments, similar to our view of the other claimed improper prosecutorial comments, did not unfairly prejudice defendant when viewed in context and in their totality.

Most of the comments were invited by the defense closing, and none were so prejudicial to deny defendant a fair trial.

¶ 117    Defendant claims the trial court erred in denying his motion for a new trial because he received ineffective assistance of trial counsel. Defendant specifically contends trial counsel was ineffective for failing to ask for a limiting instruction in regard to evidence of defendant's prior arrest, failing to introduce DNA evidence, and failing to make a better offer of proof for the eyewitness expert testimony.

¶ 118    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) counsel's actions resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the first prong, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Evans*, 209 Ill. 2d at 220. Under the second prong, prejudice is shown where there is a reasonable probability that the result would have been different but for counsel's alleged deficiency. *Id.* Failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 119    In analyzing the first claim, that trial counsel was ineffective for failing to ask for a limiting instruction in regard to evidence of defendant's prior arrest, we find defendant suffered no prejudice. There is not a reasonable probability that the result of the trial would have been different had the jury received an instruction stating that defendant's aggravated battery case should only be considered to suggest that Officer Sedlacek had a motive to falsely identify defendant. The more effective, but unsuccessful, use of this arrest was defense counsel's ability to present the jury with facts tending to diminish the police officer's identification testimony because the previous contact with defendant would indicate that he should have recognized defendant at the time of the incident and his arrest. The acquittal was not the important point: it was the officer's purported familiarity with the defendant that defense counsel skillfully brought before the jury.

¶ 120    Defendant next asserts counsel was ineffective by failing to introduce DNA evidence. Defendant has likewise failed to establish that he suffered prejudice as a result of defense counsel's failure to introduce this evidence or that it was not simply trial strategy.

¶ 121    Defendant claims he was excluded as a DNA donor to the gloves that tested positive for gunshot residue. However, this is not the case. Dr. Reich interpreted the DNA evidence as excluding defendant from the DNA found on one of the two gloves. He was not excluded as a donor on the other. The State could have rebutted this conclusion through presenting the conclusions of the Illinois State Police DNA report, which did not exclude defendant as a donor of the DNA found on both gloves. Dr. Reich also testified it was possible that defendant wore both gloves.

¶ 122    However, Dr. Reich, the DNA expert, testified at the hearing for a new trial and admitted that he extensively cut and pasted his reports. The trial court found Dr. Reich to be one of the most "incredible experts" it had ever seen testify. The defense attorney also testified at this hearing and stated that once he realized the State was not going to introduce DNA evidence and that Dr. Reich had credibility issues, he made a strategic decision not to introduce the DNA evidence and instead argue that the State's failure to introduce DNA evidence was a weakness in their case. The record, in our view, supports the finding that defense counsel's failure to introduce this evidence was a valid trial strategy and not unreasonable. See *People*

*v. Orange*, 168 Ill. 2d 138, 153 (1995) (noting that a decision which involves a matter of trial strategy will generally not support a claim of ineffective representation).

¶ 123 Lastly, the eyewitness testimony expert was not excluded because of an inadequate offer of proof from defense counsel. The trial court, exercising its discretion, made this decision after looking at the entirety of the evidence presented and the probative and prejudicial value of the proffered testimony. The eyewitness and physical evidence, while some of it circumstantial, supported defendant's conviction. Therefore, defendant was not prejudiced by the arguments counsel made in defendant's offer of proof in support of allowing expert eyewitness testimony.

¶ 124                                                    CONCLUSION

¶ 125 Based on the foregoing, we affirm the judgment of the trial court.

¶ 126 Affirmed.